UNITED STATES of America, Plaintiff-Appellee,

v.

William Monroe FRY, Jr., Defendant-Appellant.

No. 79–5482
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Aug. 4, 1980.

* Fed.R.App.P. 34(a); 5 Cir. R. 18.

Mark D. Johnson, Kansas City, Mo., for defendant-appellant.

William S. Sutton, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before GEE, RUBIN and POLITZ, Circuit Judges.

PER CURIAM:

Whether or not drug couriers fit a profile,[1] airport stops of putative couriers do. This appeal involves a typical warrantless stop, search and seizure by a Drug Enforcement Administration agent at the Atlanta airport. Two key issues were presented: the validity of the stop and eventual seizure and the district court's adoption of a federal magistrate's findings and conclusions on a motion to suppress without a hearing de novo of credibility issues by the district judge. Because both issues have been resolved adversely to the accused by recent decisions of the United States Supreme Court, we affirm the conviction.

The fact findings of the magistrate are largely undisputed. While routinely observing the deplaning of a Delta Air Lines flight from Miami/Fort Lauderdale, Florida, a known source area for cocaine, a DEA agent noticed two arriving passengers, appellant William Fry, Jr., and his companion, later identified as Thomas Gadsden. He observed the two proceed to a flight monitor as if to seek directions for a continuing flight. Both were carrying only small amounts of luggage. The DEA agent noticed that Gadsden appeared to stare directly at him while the men were talking to the Delta ticket agent. His suspicions increased when Gadsden looked back at him on two occasions as the men proceeded down the concourse.

The DEA agent learned from the ticket agent that the pair were flying together under the same last name, Norton, and had inquired about a continuing flight to Kansas City, Missouri, a city with a large population of heroin and cocaine users. He also

---

1. "The agent testified that the respondent's behavior fit the so-called 'drug courier profile'—an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs. In this case the agents thought it relevant that (1) the respondent was arriving on a flight from Los Angeles, a city believed by the agents to be the place of origin for much of the heroin brought to Detroit; (2) the respondent was the last person to leave the plane, 'appeared to be very nervous' and 'completely scanned the whole area where [the agents] were standing'; (3) after leaving the plane the respondent proceeded past the baggage area without claiming any luggage; and (4) the respondent changed airlines for her flight out of Detroit." *U. S. v. Mendenhall*, —— U.S. ——, ——— n.1, 100 S.Ct. 1870, 1873 n.1, 64 L.Ed.2d 497 (1980).

determined that the men had not made any reservations for the flight. Knowing that drug couriers followed a tactic of making ticket counter purchases at the last minute, he decided to follow the men, who proceeded to the departure gate for the continuing flight to Kansas City.

Upon his arrival at the departure gate, the agent observed that Gadsden's ticket envelope did not have luggage claim checks attached; he did not believe that Fry had any claim checks either. The gate agent informed the DEA officer that the two men, who had taken seats in the gate area, had their tickets issued in the names of S. and M. Norton. Because the two men did not appear to be related in appearance, the DEA agent decided to interview them.

The DEA agent sat down next to Gadsden, discreetly identified himself, stated that he was looking for drugs coming through the airport, and asked if he could speak to them for a few minutes. Gadsden immediately responded in the affirmative. Pursuant to the DEA agent's request, both men handed him their airline tickets. When asked for identification, Gadsden produced a drivers license in his true name. Fry indicated that his name was Norton and that he had bought both tickets. He stated, after some hesitation, that his wallet, containing his identification, had been lost or stolen while he was in Miami. Both men appeared to be very nervous, and Fry's responses seemed contrived. After returning their tickets and Gadsden's driver's license, the DEA agent asked the men whether they would allow a search of their persons and luggage.

There is a dispute about what happened thereafter. The magistrate, whose report was approved by the district judge, credited the DEA agent's version of the events. According to the DEA agent, Fry responded, "Sure, we don't have anything," and Gadsden agreed, after being pressed a second time, for his consent. The DEA agent told the men that the search could be conducted in the gate area or in a nearby Delta ticket office that would be more private. Together, all three then proceeded to the ticket office.

The DEA agent testified that, upon arrival at the ticket office, he explained to both men that he was seeking their permission to conduct a search of their person and property, that they had the right to refuse to allow the search and to consult with an attorney, and that anything found could be used against them in court. Both men indicated their understanding of their rights and agreed to permit a search. A search of Fry's bag revealed a plastic zip-lock bag containing cocaine.

We have recited the facts in detail because, although the particulars vary, the essentials are identical to those in *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Two members of the Court (Justices Stewart and Rehnquist) there held that an airport stop was not a seizure. There DEA agents approached a courier, identified themselves and asked for identification. The opinion states, "a person is 'seized' only when by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at ——, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. It continues:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[6]

[6] We agree with the District Court that the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.

Here, as in *Mendenhall*, the DEA agent merely approached Fry and Gadsden, identified himself, and asked if he could speak with them, a request they granted. Thus, following Justices Stewart and Rehnquist, "on the facts of this case, no 'seizure' of the respondent occurred." *Id.*

Three members of the Court in *Mendenhall*, however, assumed that the initial stop was a seizure, but considered that it was reasonable and, therefore, justified. *Id.* at ——, 100 S.Ct. at 1880, 64 L.Ed.2d at 513

(Powell, J., joined by Burger, C. J., and Blackmun, J., concurring). Following those Justices, the minimally intrusive act of approaching and questioning Fry and Gadsden was reasonable in light of the public interest in preventing drug traffic and the circumstances surrounding the stop, which led a trained DEA agent to suspect that Fry and Gadsden were carrying drugs.[2] Whichever alternative rationale one chooses, the facts in this case are too similar to those in *Mendenhall* to warrant a different result. The initial questioning of Fry and Gadsden, therefore, did not violate the fourth amendment.

■ The later events also did not constitute an unlawful seizure. The district court found (following the magistrate's report) that there was no force, physical restraint "or blatant show of authority." The DEA agent had returned the airline tickets to Gadsden with Gadsden's driver's license. He asked them if they would be willing to allow him to make the search. They indicated their consent. Again the facts in *Mendenhall* are parallel and the Supreme Court's reasoning is apt.

The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 [93 S.Ct. 2341, 36 L.Ed.2d 854], and is a matter which the government has the burden of proving. *Id.*, at 222 [93 S.Ct. at 2045], citing *Bumper v. North Carolina*, 391 U.S. 543, 548 [88 S.Ct. 1788, 20 L.Ed.2d 797].

*Id.* at ——, 100 S.Ct. at 1879, 64 L.Ed.2d at 511. There is adequate evidence to support the conclusion below that consent was voluntarily granted.

**2.** Here, as in *Mendenhall*, a number of otherwise innocent facts, taken in conjunction, provoked the DEA agent's suspicions: Gadsden appeared nervous when he saw the agent watching the deplaning; neither Fry nor Gadsden had any luggage; Fry and Gadsden were arriving from a source city for narcotics and departing to a city with a large market for

■ However, here, Fry and Gadsden, unlike Ms. Mendenhall, testified that they had not consented to the search. They asserted that the DEA agent began searching their bags immediately without obtaining their consent to do so and without advising them of their right to refuse. The motion to suppress was referred to a magistrate who heard the witnesses and made a report and recommendation that credited the DEA agent's account and rejected Fry's and Gadsden's story. Had the magistrate believed their version of the facts, he would have been compelled to sustain the motion to suppress. In short, the outcome of the motion to suppress rested solely upon a judgment as to whose evidence was more worthy of belief. Fry contends that he was denied due process when the district judge accepted the magistrate's fact findings and credibility determinations without conducting a new evidentiary hearing.

The point is not without appeal. It has earned the agreement of four members of the Supreme Court. However, a majority upheld the procedure here followed in *United States v. Raddatz*, —— U.S. ——, 100 S.Ct. 2406, 64 L.Ed.2d —— (1980). The Court there held that the statute, 28 U.S.C. § 636(b)(1), does not require the judge "to rehear the contested testimony in order to carry out the statutory command to make the required 'determination.'" *Id.* at ——, 100 S.Ct. at 2411, 64 L.Ed.2d at ——. The Court then held that the statute, thus construed, does not violate the due process clause of the fifth amendment or Article III of the United States Constitution.

In *Mendenhall* and *Raddatz*, the Supreme Court reviewed each of the arguments here made and set forth its reasons for rejecting them. On their authority and for these reasons, the judgment of the district court convicting the defendant is AFFIRMED.

narcotics; and Fry and Gadsden were traveling under assumed names and changing flights en route. These facts, several of which parallel the important factors in *Mendenhall, see* n.1, *supra*, are at least as substantial as those deemed by the concurring Justices in *Mendenhall* sufficient to justify the stop.