UNITED STATES of America, Plaintiff,

v.

Raymond J. PLACE, Defendant.

No. 79 CR 584.

United States District Court,
E. D. New York.

Sept. 29, 1980.

E. R. Korman, U. S. Atty., E. D. N. Y., for plaintiff; Gregory J. Wallance, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Spears, Barnes, Baker & Hoof, Durham, N. C., Neal Comer, New York City, for defendant; James D. Clark, Durham, N. C., and H. James Stadelman, Fort Lauderdale, Fla., of counsel.

PLATT, District Judge.

Defendant, who is charged with violating 21 U.S.C. § 841(a)(1), possession with intent to distribute cocaine, has moved to suppress all physical evidence taken from him by Drug Enforcement Agents on August 17, 1979. He alleges that his Fourth Amendment rights were violated when he was stopped for questioning in both Miami and LaGuardia International Airports and when his baggage was seized at LaGuardia and searched pursuant to a warrant issued by United States Magistrate John Caden.

The facts are as follows:

On August 17, 1979, Dade County Detectives Robertson McGavock, John Facchiano, Lodi Wolf and Everett Titus were observing passenger activity at the National Airlines ticket counter in Miami International Airport. Detective McGavock had taken a place in the ticket line while the other detectives stood off to one side watching the queue. (Tr. 8–9).

During the surveillance, one person, later to be identified as the defendant in the instant case, attracted Mr. McGavock's attention. (Tr. 9). Carrying two black suitcases and a brown handbag, defendant had arrived on the line directly behind Mr. McGavock, and immediately began "scanning the lobby area . . . looking very closely at each person that was seated or standing in . . . the immediate area." (Tr. 10). This systematic "scanning" continued for the entire twenty minutes that defendant spent in the line. (Tr. 10).

Five minutes after defendant entered the line, Mr. McGavock stepped out of it to speak to Detective Facchiano about the defendant.[1] As this transpired, defendant fixed his gaze upon the two detectives and continued to watch as Mr. McGavock left Mr. Facchiano and moved to different locations within the immediate lobby area. (Tr. 11–12). Each time Mr. McGavock switched positions, the defendant kept him under attentive view, though if the detective looked at him, the defendant would endeavor to appear as if he were not looking at Mr. McGavock. (Tr. 12).

Defendant finally arrived at the head of the line, paid for his ticket in cash and checked his bags. In completing this last act, he turned and looked over his shoulder to scan the lobby once again, but, when Detective McGavock came into his view he stopped scanning and focused on the detective. (Tr. 13). Defendant then turned back to the counter, completed his transaction, and began walking toward Concourse F, the departure gate for National Airlines. (Tr. 14).

Mr. McGavock then moved quickly to the counter and spotted defendant's bags on the conveyer belt. He noticed that they were tagged for LaGuardia airport, to which a National flight was scheduled to depart at 12:40 P.M.[2] (Tr. 14–15).

It is at this time that a curious ballet begins. After looking at the luggage on the conveyer belt, Mr. McGavock followed defendant as he made his way to Concourse F. Suddenly, the defendant turned and started walking back in the direction from which he had just come. As the two passed, Mr. McGavock continued on to another counter where he stopped to observe defendant. As he watched, defendant strode back to the lobby from where he had just come and walked a complete circle around the area, looking back over his shoulder continuously. (Tr. 16–17). Defendant then made his way back toward

Concourse F but stopped enroute to enter a men's restroom. (Tr. 17).

At that moment, Detective Facchiano rejoined Detective McGavock and told him that the name on the bags appeared to be Place. Not more than a minute passed before defendant came out of the restroom and began, once again, to make his way to Concourse F. The detectives followed and watched as defendant got into line to pass through the various security gates now common to all airports. (Tr. 18–19).

At this juncture, Detective Facchiano approached defendant and displayed his credentials. As he did so, Mr. McGavock met them and also displayed his credentials. A conversation ensued, the essentials of which, as testified to by Mr. McGavock, are reproduced here.

Detective Facchiano, in reply to defendant's question "was there anything wrong?" told defendant, "Sir, we have a big problem with contraband going out of here in the airport." Upon hearing this, defendant broke out into a sweat. (Tr. 19). Mr. Facchiano continued, "Sir, I was wondering whether you might show us some identification and your airline ticket." In response, defendant handed his ticket to the detective and rummaged through his brown handbag for his driver's license. Both the airline ticket and the New Jersey driver's license identified the defendant as Raymond Place. (Tr. 19–21).

As the conversation continued, it was made clear by the detectives that the "contraband" mentioned earlier was, in fact, narcotics. Defendant responded to this information by stating "Well, I don't use any stuff like that." (Tr. 21). Mr. Facchiano then asked, "Well, sir, it's nothing that you have to do but would you mind if we looked inside your suitcase." Defendant gave his consent, adding that he didn't have anything in them. (Tr. 21–22).

The two detectives looked at each other and then at their watches. The time was

---

1. The two other detectives left the area at this time. (Tr. 12).

2. When the bags disappeared out of sight, Detective Facchiano left for the loading area to see if there were any names on the bags. (Tr. 16).

12:35; defendant's flight was to leave at 12:40. Mr. Facchiano turned to the defendant and said, "Well, that's all right. Have a nice flight, Mr. Place." (Tr. 22).

Had nothing else occurred, defendant Place would probably not be in front of this Court, but defendant, as he walked back toward the security gates, turned to the detectives and said something to the effect of "Hey, I knew you guys were cops when I saw you down in the lobby." When the detectives asked him how many he had spotted, the defendant replied "Oh, four or five" and then left. (Tr. 22).

Detective McGavock then decided to look at defendant's baggage himself. He ran to the loading area and spotted the two bags on top of a cart. The name tags were apparently visible and on both of them was the name R. Place. The addresses on the tags, however, differed: the smaller of the two bore the address 1885 South Ocean Drive, Hallandale, Florida; the larger one had 1865 South Ocean Drive in the same city. (Tr. 24–25).

Mr. McGavock's next step was to check with National Airlines for a callback number on defendant Place's reservation. Upon obtaining that number, Mr. McGavock called the Police Department in Hallandale and asked them to check to see if the addresses existed and to see to what address the callback number belonged. Hallandale police advised Mr. McGavock that neither of the addresses existed[3] and that the telephone number was that for 1980 South Ocean Drive, Hallandale. (Tr. 25–27).

After completing this check, Mr. McGavock decided to call Drug Enforcement Agency officials in New York. He talked to DEA Special Agent Gerard Whitmore and relayed to him his observations, a description of Mr. Place, and the flight number and its time of arrival. (Tr. 27–28). Specifically, Mr. McGavock described defendant's scanning activities, his nervousness, the discrepancies on the baggage identification tags, the conversation with Mr.

Place and the fact that the addresses did not exist. (Tr. 27–29).

The scene shifted to New York's LaGuardia Airport where Special Agents Whitmore and Iglesias awaited the arrival of Place's flight from Miami. With the aid of Mr. McGavock's description, the two agents observed the defendant deplane. (Tr. 75–76). As described by Agent Whitmore, the defendant was trying to keep up with another male, attempting to converse with him, and, at the same time, looking about the baggage area. (Tr. 76). Furthermore, as defendant walked down the terminal, he constantly looked behind him, and, at one point, he stopped, looked at people at the next gate, and then looked behind and around himself. (Tr. 77).

Observing this behavior and fearing that he might flee if he spotted them, the agents chose not to follow the defendant but went directly to the National baggage claim area. Defendant eventually made his way to the same area but stood outside the actual pick–up location looking at every person in the area. (Tr. 77–78). When the luggage arrived, defendant Place walked into the area, claimed his bags, and after a few minutes deliberation left the area. (Tr. 78–79).

The ballet, begun in Florida, now resumed in New York. Agent Whitmore began to follow defendant who walked down a corridor and then abruptly stopped, turned around and looked straight at the agent. (Tr. 82). To avoid the appearance of "tailing" defendant, Agent Whitmore walked by him and into a stairwell. The defendant then resumed walking down the corridor, this time with Agent Iglesias not far behind. (Tr. 82).

The defendant made his way to the TWA baggage claim area where he put down his bags and used the telephone apparently to call a limousine. At this point, Agent Whitmore decided to approach the defendant; he took out his credentials and identi-

---

**3.** One of the addresses, 1865 South Ocean, did, in fact, exist but Mr. McGavock did not dis-

cover that until after the 17th. (Tr. 30).

fied himself as a Federal narcotics agent. (Tr. 83).

Defendant immediately remarked, "I knew you guys were cops. I spotted him [Iglesias] as soon as I got out of the plane." (Tr. 83). Agent Whitmore then informed defendant that the Dade County police had relayed some information about the defendant, and based on that and on Agent Iglesias' and his own observations Agent Whitmore said that he believed "There was a possibility that [defendant] was carrying narcotics." (Tr. 84).

After identifying the bags next to him as his own and asking the agents whether they actually believed he was carrying narcotics (to which Agent Whitmore said Yes), the defendant remarked that a gang of police surrounded him in Miami and searched his person and his bags and that he had been humiliated and embarrassed by these searches. (Tr. 84). The agents told defendant that their information was to the contrary to which defendant replied "I don't care what your understanding is my luggage and I were searched at the Miami Airport." (Tr. 85). After requesting and receiving defendant's airplane ticket and driver's license, (which Agent Iglesias took possession of in order to run a computer check on defendant), Agent Whitmore asked defendant to consent to a search of his luggage. Defendant apparently refused (Tr. 83) and was then told by Agent Whitmore that a search warrant would be sought to enable the agents to search his luggage and that the agents would detain his bags until a Federal judge had determined whether or not such warrant should issue. In addition, defendant was told that he was free to go, that he was not under arrest, but that he could accompany the agents and his baggage to the judge. (Tr. 88–89). Defendant declined to do so but, when Agent Whitmore was the sole agent present, he twice asked Agent Whitmore if there was "some way that we could arrange for him to leave with his luggage." (Tr. 91, 94).

Although not without some hysterics on Mr. Place's part (Tr. 93–94), the agents left LaGuardia with the bags and proceeded to Kennedy Airport where they subjected the bags to a "sniff search" by "Honey", a trained police dog. "Honey", in sniffing defendant's bags which had been intermingled with other pieces of luggage, reacted positively to the smaller bag and ambiguously to the larger. (Tr. 98). The following Monday, August 20, 1979, the agents presented these facts to United States Magistrate John Caden who issued a search warrant for the smaller bag only. (Tr. 100). Agent Whitmore then proceeded, in the presence of two other DEA agents, to search the smaller bag and discovered therein approximately 1125 grams of cocaine, the evidence which defendant now seeks to suppress.

In support of this motion, defendant argues that his Fourth Amendment rights were violated by the Dade County officers when they questioned him at Miami International Airport. It therefore follows, defendant reasons, that the subsequent action taken by DEA officials was tainted by the illegality of that encounter. He also argues that the questioning in LaGuardia was illegal, that the "sniff search" was improper, and that therefore the search of the bag was unlawful. The Government, on the other hand, contends that the initial questioning was neither a stop nor a seizure within the purview of the Fourth Amendment, or, in the alternative, that even if there was a "stop", the Dade County officers had a "reasonable suspicion" based on objective and articulable facts and could therefore constitutionally "stop" defendant. They further contend that all of the other action taken by the DEA agents was proper and did not violate defendant's Fourth Amendment rights.

There has been a spate of recent decisions in this Circuit concerning the validity of these so–called "airport stops," *see, e. g., United States v. Anparo Forero–Rincon*, 626 F.2d 218 (2d Cir. 1980); *United States v. Buenaventura–Ariza*, 615 F.2d 29 (2d Cir. 1980); *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979); *United States v. Vasquez–Santiago*, 602 F.2d 1069 (2d Cir. 1979);

*United States v. Price,* 599 F.2d 494 (2d Cir. 1979); but the starting point for any discussion of these encounters must be the Supreme Court decisions in *Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2952, 65 L.Ed.2d 890 (1980) (per curiam), and *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[4]

We begin with the *Mendenhall* decision for it is there that we find the most complete discussion, though not a satisfactory resolution, of the types of problems presented by this instant case. Briefly, the facts of that case are as follows: Ms. Mendenhall arrived in the Detroit Metropolitan Airport from Los Angeles, a "source city", was the last person to leave the plane, appeared very nervous, looked as if she were scanning the area to see if there were any agents about, carried no luggage, and changed airlines for her flight out of Detroit. Observing this behavior, DEA agents approached Ms. Mendenhall and asked to see some identification and her airline ticket. After examining both and finding discrepancies therein, the agents asked her to accompany them to the DEA office for further questions. She apparently acceded to this request and went to the office with the agents where she consented to a search of her person by a policewoman. This search produced the two packets of heroin that Ms. Mendenhall later sought to suppress. *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. at 1873–74.

In considering the validity of the initial encounter, the majority of the Supreme Court split along two lines. Justice Stewart, joined by Justice Rehnquist, found that this encounter was not a "stop" or "seizure" governed by the Fourth Amendment because Ms. Mendenhall's freedom of movement was not restrained. The test postulated for gauging whether there was such a restraint is essentially one of reasonableness; it is a stop, governed by the Fourth Amendment "if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 1877. Justice Stewart continued his discussion by stating "In the absence of some such evidence [of offensive or threatening police conduct], otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.*

■ Justice Powell, with whom the Chief Justice and Justice Blackman concurred, did not consider the question of whether this was a "stop" or a "seizure" governed by the Fourth Amendment because he believed that that issue was not raised properly in the *Mendenhall* case. Instead, he considered the facts and legal issues to be within the ambit of the rule announced in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The *Terry Rule* establishes that "a reasonable investigative stop does not [violate] the Fourth Amendment." *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. at 1881. The reasonableness of a stop depends upon the facts of each case and, in particular, (i) the public interest served by the stop, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officials relied in light of his knowledge and expertise. *Id.* See also, *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Vasquez, supra; United States v. Price, supra.*

In addition, our own Circuit has enumerated the criteria by which to evaluate these "airport stops" as follows:

"(1) . . . these stops will be deemed reasonable, and therefore constitutional even though warrantless, so long as they are

---

4. One panel of the Second Circuit has suggested, in dicta, that *Mendenhall* does not control in these types of cases *on the issue of reasonableness* because it has no majority opinion. On that issue, *see United States v. Anparo Forero–Rincon, supra,* note 3. The *Reid v. Georgia* opinion, which was issued after the *Forero–*

*Rincon* opinion does, however, have a majority ruling on the issue of reasonableness. In any event, this Court believes that the approaches suggested by the Supreme Court decisions are to be given much credit, even in the absence of a majority opinion in *Mendenhall.*

minimally intrusive upon the detained traveler and are initiated only after the agent has observed specific and articulable facts to support a suspicion that the traveler is engaging in criminal activity and that the stop is immediately necessary, *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979), and (2) that the reasonableness of the agent's suspicion must be judged upon the particular facts of each case, *United States v. Buenaventura–Ariza*, 615 F.2d 29 (2d Cir. 1980)." *U.S. v. Forero–Rincon*, Slip Op. at 219. (This approach naturally assumes that the "stop" is governed by the Fourth Amendment, a situation which may or may not exist in the instant case.)

With the foregoing as our guide, we examine the facts of this case.

Defendant was approached in Miami International Airport by two detectives who, according to the testimony which we credit, displayed their credentials and politely asked defendant to produce some form of identification and his airline ticket. Defendant did so. There is no evidence that the detectives used physical restraint in any form whatsoever; there is no evidence of any offensive contact; there is no evidence of any threatening gestures; and there is no evidence of any form of menacing whatsoever. *See U.S. v. Mendenhall, supra*, 100 S.Ct. at 1877. Moreover, the questions posed to defendant were prefaced by "Sir" and there were few, if any, imperative statements made by the detectives. The entire encounter was marked by civil and polite behavior on the part of the detectives who apparently took great care in their handling of the defendant. In addition, the encounter took place in a busy public area where the defendant could feel relatively safe that the police would not abuse him. *Compare Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

■ In light of all of the circumstances surrounding the incident, we conclude that a reasonable person would have believed that he was free to leave. In fact, defendant was free to leave and did so. In holding that the questioning does not fall within

the ambit of the Fourth Amendment, we echo Justice Stewart's statement that:

"The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that a person asking the questions was a law enforcement official. *See Terry v. Ohio, supra*, 392 U.S., at 31, 32–33, 88 S.Ct., at 1885–1886 (Harlan, J., concurring)."

*United States v. Mendenhall, supra*, 100 S.Ct. at 1877.

The recent Fifth Circuit Court of Appeals decision in *United States v. Fry*, 622 F.2d 1218 (5th Cir. 1980) (per curiam), further supports our holding that there was no seizure or stop. In that case, the DEA agent, whose attention had been attracted by the odd behavior of a pair of individuals walking through the airport, sat down next to these individuals, discretely identified himself, and asked if he could speak to them for a few moments. He then requested some form of identification, and when one of the individuals gave what he considered to be evasive answers to that request, he then asked the men if they would allow a search of their persons and of their luggage. Holding that there was no stop governed by the Fourth Amendment, the Fifth Circuit panel wrote

"Here, as in *Mendenhall*, the DEA agent merely approached Fry and Gadsden, identified himself, and asked if he could speak with them, a request they granted. Thus, following Justices Stewart and Rehnquist, 'on the facts of this case, no "seizure" of the respondent occurred.'" *Id.*

*See also, People v. Guzman*, 108 Cal.App.3d 601, 166 Cal.Rptr. 633 (1980) ("the Fourth Amendment prohibits unreasonable seizures, not eye contacts and greetings.").

This Court understands that our own Circuit has not yet adopted the approach we have just taken, but absent indication to the contrary, we believe, as do at least two Justices on the Supreme Court, that this approach is in keeping with the letter and

the spirit of the Fourth Amendment as well as the holdings of recent Appellate Court decisions. However, because the state of the law is so uncertain and because our Circuit has not yet adopted the approach we have taken, we proceed in the alternative to examine the facts to determine whether or not there were objective and articulable facts upon which the agents could have based a reasonable suspicion that defendant was engaged in illegal activity.[5]

■ In determining whether the facts and inferences derived therefrom support a reasonable suspicion, we are guided by the three criteria set out by the Second Circuit in *United States v. Forero–Rincon, supra,* Slip Op. at 221. First, the Dade County detectives' observations must be viewed as a whole, not as discrete and separate facts. Second, the observations must also be viewed through the eyes of an agent who is trained and experienced in discerning in ostensibly innocuous behavior indicia of narcotics trafficking. Third, the fact that conduct is as consistent with innocence as it is with guilt does not preclude that conduct from supporting a reasonable suspicion of criminal activity.

Detective McGavock's suspicion was based upon the following facts:

1. Defendant Place was departing from a "source city."

2. Defendant systematically scanned the immediate area in the lobby in which he was standing and looked very closely at each person that was seated or standing in that area.

3. Defendant noticed and paid close attention to Mr. McGavock when he left the line.

4. Defendant stared directly at the detectives two or three times as the detectives moved around the lobby.

5. When buying his ticket and checking his baggage, the defendant turned and looked over his shoulder to scan the lobby once again.

6. Defendant paid for his ticket in cash.

7. After leaving the ticket counter and heading toward the gate from which he was to depart, defendant stopped for no apparent reason, turned around to look at anyone who might be behind him, and headed back to the lobby from where he had just come.

8. Upon reaching the lobby, defendant Place walked a full circle around the lobby while looking back over his shoulder continuously to see if he was being followed.

This odd, if not bizarre, behavior, speaks for itself. It is certainly not normal conduct to do what defendant did in the Miami International Airport. And while the behavior itself may not be guilty behavior, the third criteria of the test outlined above indicates that it need not be so.

■ Viewed as a whole and through the eyes of an experienced agent, we believe that defendant Place's conduct could easily have given rise to a reasonable suspicion that some illegal activity was afoot. Defendant's behavior certainly did serve to make himself distinguishable from the rest of the crowd milling about at the airport. His behavior was not merely the odd behavior of an eccentric; nor was it the normal behavior of an every day airline traveler. Furthermore, the recent Supreme Court decision in *Reid v. Georgia, supra,* does not militate against our finding in this case that there was reasonable suspicion to justify the stop. In that case the only suspicious conduct exhibited by the defendant was that he preceded another person and occasionally looked backward at him as they proceeded through the airport. The Supreme Court held, as a matter of law, that this conduct could not give rise to a reasonable suspicion, characterizing it as "simply too slender a reed to support the seizure in this case." *Id.,* 100 S.Ct. at 2754.

In the instant case, we have found at least eight objective and articulable facts

---

**5.** Proceeding in the alternative in these types of cases was also adopted recently by the Fifth Circuit. *See United States v. Fry, supra.*

upon which a reasonable suspicion could be based. This Court believes that the facts of the case now before us are easily distinguishable from the facts in *Reid v. Georgia* ; and, as our own Circuit has indicated, "the reasonableness of the agent's suspicion must be judged on particular facts of each case, *United States v. Buenaventura–Ariza*, 615 F.2d 29 (2d Cir. 1980)." *United States v. Forero–Rincon, supra*, Slip Op. at 220. Therefore, we hold that the Dade County detectives' suspicion was reasonable because it was based on objective and articulable facts and that the stop, if it can be characterized as such, was therefore valid. *See id.; United States v. Vasquez, supra; United States v. Vasquez–Santiago*, 602 F.2d 1069 (2d Cir. 1979); *United States v. Price, supra; United States v. Rico, supra; see also United States v. Fry, supra; United States v. Klein*, 626 F.2d 22 (7th Cir. 1980).

Having established the validity of the encounter in Miami International Airport, we now turn to the events which transpired later the same day in LaGuardia Airport where Special Agents Whitmore and Iglesias awaited defendant's arrival. As the above recitation of facts indicates, these agents observed defendant's behavior before they approached him for questioning. It should also be noted that these agents were in possession of the information communicated to them by the Dade County detectives. That information included not only the observations made prior to the encounter in Miami International Airport but also a report of the defendant's behavior during that encounter, the defendant's parting remarks, the fact that the addresses listed on defendant's baggage were (i) not the same address and (ii) apparently did not exist, and that the callback number was located at even yet a third address.

■ As to this encounter, we reiterate our conclusion that the Fourth Amendment does not prohibit law enforcement officials from questioning private citizens as long as that private citizen reasonably believes that he is free to end the conversation and leave at any time. Consequently, we believe that Special Agents Whitmore and Iglesias could have approached and questioned defendant even if they did not have a reasonable suspicion that he was engaged in criminal activity. *See United States v. Mendenhall, supra* (Stewart, J.).

■ Nevertheless, this encounter became a stop when Detective Iglesias took possession of defendant's driver's license and when Detective Whitmore took possession of defendant's baggage. While this was not an actual restraining of the person of the defendant, we believe that such conduct on the part of the agents went beyond the mere questioning of a citizen to a type of police action that must be justified by more than a desire to investigate. We will discuss the validity of the detention, *infra*, but for now, suffice it to say that the detention of the personal belongings of an individual questioned by the police is also a detention of that person. Such conduct, we believe, would lead a reasonable person to believe that he was not free to end the conversation and leave, but rather was being subjected to police domination and subservient thereto. This encounter thus became a stop and must perforce be based upon objective and articulable facts which must have given rise to a reasonable suspicion that defendant was engaged in illegal activity.

As indicated above, there were ample facts upon which a reasonable suspicion could be based to justify the encounter in Miami International Airport. These facts, listed above, were also communicated to Special Agent Whitmore and we shall not reiterate those facts here. We shall list, however, those additional facts which Special Agents Whitmore and Iglesias relied upon in making the stop of defendant in LaGuardia Airport:

1. Defendant Place broke out into a sweat when asked about narcotics by Detective McGavock and Facchiano in Miami International Airport.

2. Defendant Place's parting remark to the same detectives that he had spotted them in the lobby.

3. The discrepancy between the addresses listed on the identification tags attached to defendant's baggage.

4. The fact that neither of those addresses were known to exist.[6]

5. Defendant's scanning activity in LaGuardia Airport.

6. Defendant's nervous behavior and conduct in LaGuardia Airport.

7. Defendant's spontaneous remark on being approached by the special agents that "I knew you guys were cops. I spotted him as soon as I got out of the plane." (Tr. 83).

■ These facts, taken together with those facts communicated to Agent Whitmore by the Dade County authorities, easily support a finding that the stopping of defendant by Special Agents Whitmore and Iglesias was based upon a reasonable suspicion supported by objective and articulable facts. We do not repeat here what we stated above about defendant's behavior. We only note that this is not the conduct of the everyday traveler and that, in fact, the agents would have been remiss had they not investigated this conduct further.

Defendant's third argument in support of the suppression of the evidence obtained by the search of his bags pursuant to the Magistrate's warrant is that the detention of the suitcase by Agent Whitmore violated his Fourth Amendment rights. Defendant contends that such a seizure must take place pursuant to a warrant or upon a showing that probable cause existed at the time of seizure. This question, at least according to our research, is a novel one in our Circuit. However, we have the benefit of a recent Seventh Circuit Court of Appeals opinion which addressed a strikingly similar factual situation.

In *United States v. Klein, supra,* at 25, the Seventh Circuit held that the mere detention of a person's baggage may be supported by a reasonable suspicion that the bags contained contraband. Because it is instructive to do so, we quote from that decision extensively:

Nevertheless, we are left with the important question whether probable cause was necessary to *detain* the suitcases, giv-

en the fact that no probable cause existed at that point to *search* the suitcases. As mentioned above, in *Terry v. Ohio,* 392 U.S. 1, [92 S.Ct. 1921] (1968), the Supreme Court sanctioned the detention of individuals for further investigation when a police officer had reasonable suspicion to believe something unlawful was afoot. Our research has uncovered no case in which a court has confronted a detention situation precisely like the one before us now, but the Supreme Court did address an analogous situation in *U.S. v. Van Leeuwen,* 397 U.S. 249, [90 S.Ct. 1029, 25 L.Ed.2d 282] (1970), where it extended the *Terry* logic to the detention of parcels of mail believed to contain contraband.

In *Van Leeuwen,* a postal clerk received for first–class mailing two packages, each weighing twelve pounds, with one addressed to a post–office box in Van Nuys, California and the other to a post–office box in Nashville, Tennessee. Each package was registered and insured for $10,000 and was to be sent airmail. The postal clerk found all these facts suspicious and voiced his suspicions to a policeman who happened to be present. The policeman then noticed that the return address on each package was that of a vacant housing area and that the person who had mailed the packages was driving a car with Canadian license plates.

Because of these suspicious facts, the police detained the packages pending further investigation. By the next day, there was information sufficient to establish probable cause for issuance of a search warrant; a search warrant was obtained, the packages were opened, inspected, resealed and sent on their way.

Recognizing that the parcels in question were first–class mail and therefore free from postal inspection except in accordance with the Fourth Amendment. 397 U.S. at 251, [90 S.Ct. at 1031], the Court nevertheless held that the detention pending further investigation of the packages in that case was justified:

6. It is unclear from the testimony taken at the suppression hearing whether or not Mr. McGa-

vock told Agent Whitmore that the callback number was located at still a third address.

The nature and weight of the packages, the fictitious return address, and the British Columbia license plates of respondent who made the mailings in this border town certainly justified detention, without a warrant, while an investigation was made.... The only thing done here on the basis of suspicion was detention of the packages. There was at that point no possible invasion of the right "to be secure" in the "persons, houses, papers, and effects" protected by the Fourth Amendment against "unreasonable searches and seizures." Theoretically–and it is theory only that respondent has on his side–detention of mail could at some point become an unreasonable seizure of "papers" or "effects" within the meaning of the Fourth Amendment. Detention for 1½ hours–from 1:30 p. m. to 3 p. m.–for an investigation certainly was not excessive; and at the end of that time probable cause existed for believing that the California package was part of an illicit project.

397 U.S. at 252, [90 S.Ct. at 1032].

By the same token, we hold that the detention of the suitcases pending further investigation in this case was not an unreasonable seizure. We are cognizant of the possible difference between the privacy interest in packages surrendered in the mails and that in luggage carried by an individual. However, in this case we believe that defendants' privacy interest in their luggage was adequately protected. In *Arkansas v. Sanders*, 442 U.S. 753, [99 S.Ct. 2586, 61 L.Ed.2d 235] (1979), the Supreme Court elaborated on the scope of an individual's privacy interest in his luggage:

One is not less inclined to place private, personal possessions in a suitcase merely because the suitcase is to be carried in an automobile rather than transported by other means or temporarily checked or stored.... [T]he very purpose of a suitcase is to serve as a repository for personal items when one wishes to transport them.

442 U.S. at 764, [99 S.Ct. at 2593] [footnote omitted].

In a similar vein, the Court in *Van Leeuwen* recognized the great privacy interest in the contents of first–class mail, stating that " 'the use of the mails is almost as much a part of free speech as the right to use our tongues.' " *Van Leeuwen, supra*, 397 U.S. at 251, [90 S.Ct. at 1032], quoting from *Milwaukee Pub. Co. v. Burleson*, 255 U.S. 407, 437, [41 S.Ct. 352, 65 L.Ed. 704] (1921) (Holmes, J., dissenting). The Court went on to say that

[n]o interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited. The significant Fourth Amendment interest was in the privacy of this first–class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained.

397 U.S. at 253, [90 S.Ct. at 1032]. *By the same token, defendants' privacy interest in the contents of their suitcases in this case "was not disturbed or invaded until the approval of the magistrate was obtained."*

We hold that at the time they decided to detain the bags while waiting for a canine trained in drug detection, the DEA agents had reasonable suspicion to believe that the bags contained contraband; they would have been remiss in not detaining the bags for further investigation. (Emphasis added).

*Id.* at 25–26.

We are not faced with a taking into custody of a person which must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). We are not faced with an actual search which also must be based on probable cause. We are faced with a detention of luggage. If detention of a person can be had based on a reasonable suspicion, see *Terry v. Ohio, supra*, there is no reason why detention of physical items cannot be based on the same standard.

Consequently, we agree with the Seventh Circuit's reasoning that detention of the bags in this case need only be based upon a reasonable suspicion.[7] The facts delineated above, as well as the defendant's behavior during the questioning, were sufficient to raise in the agents mind a reasonable suspicion to believe that the bags contained narcotics. We therefore hold that defendant's Fourth Amendment rights were not violated by the detention of the bags by the DEA agents.

Defendant's final argument in support of his suppression is that his Fourth Amendment rights were violated when his two suitcases were subjected to sniff searches by the police dog named Honey. Defendant does not contest the validity of sniff searches *per se*, but rather asserts that this particular search was "carried out under such circumstances reasonably calculated to achieve a tainted reaction from the dog." We have reviewed the testimony taken at the suppression hearing and find nothing to support defendant's claim. The bags were presented to the dog one at a time, along with twenty or thirty other parcels. The dog gave a positive reaction to the smaller bag and an ambiguous reaction to the larger bag. There is nothing in the record to suggest that the reaction was contrived by the agents or by the dog handler. We therefore deny defendant's motion on this ground.

On the basis of the foregoing, we deny defendant Raymond Place's motion to suppress the evidence seized from him on August 17, 1979.

SO ORDERED.

---

7. Should, however, it be determined that a detention of luggage must be based on probable cause we note here that in our opinion there was probable cause in this case to detain the bags. Because of the Seventh Circuit opinion and our agreement therewith, we need not pass on that question; but were we called upon to do so we would hold that there was.