**UNITED STATES of America, Plaintiff,**

v.

**Robert M. HARTH and Russell C. Cruz, Defendants.**

**No. 86–8106–CR.**

United States District Court, S.D. Florida.

Feb. 9, 1987.

---

Leon B. Keller, U.S. Atty., and Karen L. Atkinson, Asst. U.S. Atty., West Palm Beach, Fla., for the Government.

Joseph S. Karp, of Bernstein, Narkier, Monchick & Karp, West Palm Beach, Fla., for defendant Robert Harth.

Donald F. Spain, Coconut Grove, Fla., for defendant Russell Cruz.

## ORDER DENYING MOTION TO SUPPRESS

PAINE, District Judge.

This cause comes before the court on defendant Harth's motion to suppress approximately 505 kilograms of cocaine which was seized on his boat by deputies of the Palm Beach County Sheriff (DE 49). As grounds for the motion, Harth states that he did not consent to the search of the boat. The court previously granted Cruz's motion to adopt Harth's motion to suppress (DE 55). The Government maintains that Cruz lacks standing to challenge the search of Harth's boat and thus moves for reconsideration of the order granting the motion to adopt.

The court held an evidentiary hearing on these motions on February 5, 1987. Representing the parties were Karen Atkinson, Assistant United States Attorney, for the Government, Joseph S. Karp for defendant Harth, and Donald F. Spain for defendant Cruz. The court heard testimony by William Andrea, Glen Armstrong, Carter Osleber, and Thomas Hill for the Government and Robert Harth and Russell Cruz for the defendants. Having heard the testimony and observed the demeanor of the witnesses, reviewed the court file, and studied the relevant authorities, the court renders the following findings of fact and conclusions of law.

### Findings of Fact

1. On September 27, 1986, William Charles Andrea and Glen Armstrong, deputies of the Palm Beach County Sheriff, Palm Beach County, Florida, were assigned to the Marine Enforcement Unit and were on patrol at the Phil Foster Boat Ramp in Riviera Beach, Florida. Both were armed and in uniform. At approximately 10:30 p.m., the officers observed a twenty-six-foot North American open fishing vessel approach the south loading ramp of the park. The boat docked, and the defendants debarked carrying a large cooler. The deputies engaged the defendants in casual conversation consisting approximately of "how's it going" or "did you have any luck." Armstrong testified that one of the defendants immediately opened the cooler and said that they had had "great luck." The cooler contained approximately twelve dolphin, snapper, and possibly grouper. Andrea found the fish unusual because dolphin on the one hand and snapper and grouper on the other are caught with two different kinds of tackle. Armstrong found the defendants' alleged catch unusual because the fish were all nearly the same size and additionally it had not been a good night for fishing. Armstrong was also surprised that the dolphin were on the top of the cooler, because they should have been caught during the day and thus would have been at the bottom. Armstrong saw four brand-new, expensive rods and reels which were not rigged. Armstrong noted the absence of both a fishing knife and the smell of bait.

2. Harth went to the parking lot area and returned with a black El Camino truck and Float-On Trailer which he backed deep into the water. After the defendants tried twice unsuccessfully to attach the boat to the trailer, Andrea offered his help, which the defendants accepted. Both Andrea and

Armstrong thought it unusual that the trailer was nearly submerged in the water and the boat pulled on by hand rather than driven on by engine, but neither of them could attribute this to illegal activity. Upon pulling the bow line, Andrea thought the boat seemed "abnormally heavy." The defendant Robert Harth testified that the defendants had asked the deputies where to clean fish. Armstrong owned a boat similar to Harth's, and Armstrong engaged Hearth in conversation about the boats for approximately ten minutes. Armstrong testified that Harth may have had a few beers but that Harth was very coherent and made concise and responsive remarks about the vessel.

3. Following these occurrences, Andrea asked Harth for his boat registration and personal identification. Andrea testified that he believed Harth to be the boat operator and that he asked for the registration and identification as a matter of standard procedure. Harth testified that he complied with these routine requests as a matter of course, such as one would comply on a traffic stop. Andrea testified that at this point Harth appeared "extremely nervous" and that Harth's hand was "uncontrollably" shaking. Harth testified that at this point he was nervous and shaking. At some point Armstrong went to the patrol boat to check Harth's license and registration with the United States Customs Service in Miami.

4. At this point, Andrea asked Harth for permission to search the boat. Andrea testified that he asked Harth "if I could search the boat," and that Harth said "okay." In his report composed on or near the night of the incident, Andrea wrote that he had asked, "do you mind if I go aboard and search your boat." Andrea remembers using the word "search" rather than "look around."

5. Armstrong testified that he heard Andrea ask Harth, "can I go up on your boat and search it." Armstrong expected Harth to be surprised at the use of the term "search" and was surprised at Harth's *lack* of surprise at the use of that word.

6. Harth testified that Andrea asked if he could "look in" the boat. Harth said he gave Andrea permission because Andrea was a cop and Harth "knew [he] had no choice."

7. Special Agent Carter Osleber of the Drug Enforcement Administration (DEA) saw Harth at approximately 3:30 a.m. on September 28, when Harth and Cruz were in custody at the Palm Beach County Sheriff's Office. Osleber testified that Harth gave a Mirandized statement that he and Cruz were having trouble putting the boat on the trailer and a police officer asked for permission to search the boat, and that "I [Harth] let him." Osleber also testified that Andrea had told Osleber that Andrea had asked for permission to search the boat and that Harth had let him. Osleber believes Andrea used the term "search" rather than "look" although he is not certain.

8. Defendant Russell Cruz testified that Andrea asked Harth if the officers could "look around" the boat because of its similarity to Armstrong's boat. Cruz also testified that on September 27 he had consumed a bottle of Bacardi rum and two six-packs of beer and that he was drunk at the time of the stop. After Cruz was placed under arrest he vomited, although Armstrong testified that Cruz appeared to be "fine" before and after the vomiting. Cruz' testimony that the purpose of the boarding was the similarity of the boats is not credible considering the lack of corroboration by any witness, Cruz' alleged intoxication, and his dubious credibility.

9. DEA Special Agent Thomas M. Hill spoke with Cruz on October 16, 1986, when Cruz was in custody at the United States Courthouse in West Palm Beach. Cruz stated that on September 27 Cruz had overheard a deputy sheriff ask Harth "do you mind if we board the vessel and look around" and that Harth gave his consent to the boarding.[1]

---

**1.** Cruz has moved to suppress these statements for alleged violations of *Miranda v. Arizona*, 384 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Because the statements are not vital to the in-

10. No guns, threats, or intimidation tactics were used by the deputies in seeking to gain access to the boat.

11. Having observed Harth's demeanor on the witness stand, the court finds that his statement that he felt he "had no choice" but to consent to the search reflects not that his will was overborne by color of office but that he knew the police would find the cocaine one way or another. Thus, the court believes that Harth consented to the search because he knew that his refusal would not affect the end result.

12. In this regard, it is irrelevant whether the deputies used the term "search" or "look around." The boat was a small open fisherman with no cabin. Under all of the circumstances, Harth should have expected that two uniformed officers who wanted to board and look around the interior of his boat intended to open hatches, cabinets, and other enclosures. The court finds as a matter of fact that when Harth consented to the search he expected the officers would not simply stand on deck but also would open hatches, cabinets, and other enclosures.

13. Andrea and Armstrong testified that Harth boarded the boat before Andrea. According to Harth, Andrea boarded first. Andrea testified that Harth then opened the center console. Harth testified that it was Andrea who opened the center console, which contained tools. Andrea wanted to open the anchor locker, which was locked. Harth said he did not have the key. Andrea thought it highly unusual that the anchor locker would be locked. A hatch was opened which contained a duffel bag, which Harth stated contained clothes. Andrea testified that he did not remember who opened this hatch, while Harth testified that Andrea opened the hatch. Andrea testified that the duffel bag was light and soft. He concluded that it contained clothes and replaced it.

14. The third hatch to be opened was a deck locker covered with a large cushion. Andrea lifted the cushion and handed it to Harth, who took it and held it. Andrea then opened the hatch under the cushion.

Andrea testified that in his plain view were the anchor, lifejackets, a plastic bucket containing a drill, and five to seven standard kilogram plastic packages containing what appeared to be cocaine. Andrea testified that he could see the cocaine without lifting the lifejackets or anchor. Harth testified that this hole was two to three feet deep and contained 200 feet of anchor rope and ten to twelve lifejackets and that therefore the cocaine was not visible to the naked eye. The court finds this portion of Harth's testimony not credible.

15. Harth asserted on direct examination that he did not consent to a search of the boat. Harth conceded on cross-examination that he never told Andrea to get off the boat or to get a search warrant.

16. A complete search of the vessel revealed 505 kilograms or approximately 1100 lbs. of cocaine.

17. Twenty to thirty minutes elapsed between the time when the boat first came in and the defendants' arrest.

*Conclusions of Law*

1. The events described occurred in the Southern District of Florida.

2. The court incorporates herein every finding of fact which is also a conclusion of law.

3. Harth's consent would provide the only justification for the search.

4. A warrantless search can be conducted pursuant to consent. When the subject of a search is not in custody, the Government must demonstrate that the consent was voluntary. The court must determine voluntariness from the totality of the surrounding circumstances. Although knowledge of a right to refuse consent is a factor to be considered, the Government need not prove that the one giving permission to search knew he had a right to withhold consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

stant motion, the court need not determine their    admissibility for present purposes.

5. Among the factors to be considered in evaluating whether a defendant's consent was voluntary are the voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. None of these factors is controlling. *United States v. Phillips,* 664 F.2d 971, 1023–24 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *accord United States v. Chemaly,* 741 F.2d 1346, 1352 (11th Cir.1984).

6. The absence in this case of force, physical restraints, or "blatant show of authority" by the officers is a factor tending to show voluntariness. *See United States v. Fry,* 622 F.2d 1218, 1221 (5th Cir.1980) (per curiam).[2] Although subtle coercion in the form of an assertion of authority or color of office by police officers may make what appears to be a voluntary act an involuntary one, the fact that the officers were uniformed cannot alone support a conclusion that the defendant submitted to the color of their authority. *United States v. Griffin,* 530 F.2d 739, 742–43 (7th Cir. 1976); *accord United States v. Peterson,* 524 F.2d 167, 178 (2d Cir.1975), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *United States v. Savage,* 459 F.2d 60, 61 (5th Cir.1972) (per curiam), *vacated on other grounds,* 483 F.2d 67 (5th Cir.1973). Thus, Harth's testimony that he felt he had no choice but to consent to the search cannot without more establish coercion. This is particularly true where, as here, the court has found that Harth consented in part because he knew the police would find the cocaine one way or another.

7. A consent search is unreasonable under the Fourth Amendment if the consent was induced by deceit, trickery, or misrepresentation by police. *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir.1977).

The only evidence of misrepresentation, deceit, or trickery is Cruz' testimony that the officers' stated purpose in seeking to board the vessel was the similarity of Harth's boat to Armstrong's, and the court has found this testimony not credible. Thus, there is no credible evidence of deceit, trickery, or misrepresentation by the deputies.

8. Harth's actions in accompanying the deputies on board, answering Andrea's questions about the contents of certain hatches or cabinets, and holding the deck cushion while Andrea opened the hatch under it, are factors demonstrating Harth's cooperation with the officers and the manifestation of his consent. *Phillips,* 664 F.2d at 1023–24.

9. Harth's testimony that he did not know he had the right to refuse the search, to the extent it is credible, is not dispositive. *Schneckloth,* 412 U.S. at 249, 93 S.Ct. at 2059.

10. Harth's knowledge that a search would almost certainly demonstrate his guilt does not preclude the finding of voluntary consent, *Griffin,* 530 F.2d at 742, particularly considering the court's finding that Harth consented because he knew the police would find the cocaine whether or not he consented.

11. The only restraint on a validly authorized search, whether pursuant to consent or warrant, is that the scope of the search be limited to the terms of its authorization. *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2410, 65 L.Ed.2d 410 (1980). Considering that the boat was an open fisherman without a cabin, Harth's consent to the search of the vessel would be "hollow indeed if it [did] not include permission to search its contents and component parts." *United States v. Milhollan,* 599 F.2d 518, 527 (3d Cir), *cert. denied,* 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979). Andrea's actions in opening various hatches and cabinets therefore did not exceed the scope of

---

**2.** Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of*

*Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

the consent. In addition, the cocaine which was initially seized was in plain view when the last hatch was opened. The evidence therefore was legally seized pursuant to the consent to the search.

### Conclusion

It is therefore

ORDERED and ADJUDGED that defendant Harth's motion to suppress (DE 49) is denied. It is further

ORDERED and ADJUDGED that the Government's oral motion to reconsider this court's order granting Cruz' motion to adopt Harth's motion to suppress (DE 55) is denied as moot.