UNITED STATES of America, Appellee,

v.

Raymond J. PLACE,
Defendant-Appellant.

No. 1312, Docket 81–1034.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1981.

Decided Sept. 16, 1981.

As Amended Oct. 8, 1981.

James D. Clark, Durham, N. C. (Spears, Barnes, Baker & Hoof, Durham, N. C., of counsel), for defendant-appellant.

Gregory J. Wallance, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., John B. Latella, Jr., Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

The pivotal question raised by this appeal is whether a warrantless government seizure of a person's effects for a substantial period of time upon reasonable suspicion but without probable cause violates his Fourth Amendment rights. We hold that it does.

Raymond J. Place appeals from a judgment of conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), entered in the Eastern District of New York by Judge Thomas C. Platt after denial by a Memorandum and Order, 498 F.Supp. 1217, of his motion to suppress the contents of luggage seized from him at LaGuardia Airport, and his subsequent plea of guilty with reservation of his right to appeal the ruling on his motion to suppress. Place contends that in violation of the Fourth Amendment law enforcement officers stopped him at both Miami International and LaGuardia Airports without specific articulable facts justifying a reasonable suspicion that he was engaged in unlawful activity and that they made a warrantless seizure of his suitcases at LaGuardia Airport without probable cause. Since the warrantless LaGuardia seizure of his suitcases without probable cause was unreasonable, precluding their being used as evidence against him, we reverse.

On Friday, August 17, 1979, Place entered the Miami International Airport for the purpose of boarding a National Airlines flight to New York's LaGuardia Airport. While on line to purchase his ticket he attracted the attention of two Dade County detectives who were observing passengers in the terminal. The officers observed him scanning the area of the terminal and noticed that he appeared extremely nervous. They watched him for 20 minutes while he stood on line for his ticket and noticed that he in turn was beginning to watch them, although he pretended not to do so.

After Place had purchased his ticket and checked his bags, the detectives separated. One followed Place as he headed for the departure gate, the other went to check the name on Place's baggage. Place did not, however, proceed directly to the departure gate. Instead he walked part of the way there, turned around, walked around the waiting room in a circle while looking over his shoulder, and then stopped in a rest room.

The two detectives rejoined at this point, and, when Place came out of the rest room shortly thereafter, they followed him to the airline security checkpoint. At this point the agents proceeded to approach Place, asking him his name and requesting that he produce identification. He gave both. The detectives explained that they were investigating narcotics traffic and requested the right to examine Place's baggage. Place said that he did not use narcotics, that he did not have any in his baggage, and that the detectives were welcome to examine that baggage. Because there were only five minutes left before Place's flight to New York, the detectives did not search the bags and bid him farewell. As they parted Place turned around and said to the officers that he had recognized that they were policemen.

This remark caused the detectives to rush to the baggage loading area and re-examine Place's bags. In so doing they noted Place's address on the bags and observed a slight discrepancy between the street numbers given on the two bags. The detectives then obtained from National Airlines the call back number Place had given it for his reservation. They called the police department of Hallendale, Florida, the town in which the baggage addresses were located,

and inquired whether those addresses existed and what the address associated with the phone number was. They were informed that neither address existed but that the number was that of a third address on the same street.

On the basis of this incident and the information they had obtained, the detectives called Special Agent Gerard Whitmore of the New York office of the Drug Enforcement Administration (DEA). They informed Whitmore of the events that transpired at Miami International Airport and of the information they had obtained about Place.

Relying on this information, Agent Whitmore and another DEA agent, Alfredo Iglesias, waited for Place at the National Airlines arrival gate in LaGuardia Airport. They recognized Place among the passengers arriving at the gate from the description they had received. He was engaged in a conversation with another passenger as he and that passenger walked through the terminal. While the two walked through the terminal, Place surveyed the area around him, as he had done in Miami. Fearing that he would spot them if they continued observing him, the agents proceeded to the baggage claim area, awaiting his arrival.

Place soon arrived near the baggage claim area, but did not enter it. Instead he stood outside, again scanning the area. When the flight's luggage arrived he entered the area. After fiddling with the handle of one bag, he picked up his two bags and walked out of the area. The two agents followed him, but were careful to avoid appearing to do so. Place walked to the TWA baggage claim area, continuing his scanning as he went. When he arrived there he used one of the telephones, apparently to call a limousine.

Agent Whitmore now decided to interview Place. He and Agent Iglesias walked up to Place and identified themselves as federal narcotics agents. Place responded by saying that he had known that the two were "cops." He then asked why he was being stopped and was told it was because, based on information from the Dade County police and on their own observations, the agents suspected him carrying narcotics. Place did not say anything and Agent Iglesias asked him if the bags he was carrying were his. He replied that they were.

At this point Place stated that a number of police at the Miami Airport had surrounded him and searched his baggage. This was contrary to what the agents had been advised by the Dade County detectives. Whitmore stated that he had understood that Place had not been searched. Place replied that that understanding was incorrect; he had, he claimed, been searched. The agents then asked for and Place produced identification—a New Jersey driver's license and his airline ticket receipt.

Agent Whitmore now asked Place if he would consent to a search of his baggage. Place refused. Whitmore told Place that the agents were "going to take the luggage to a neutral party, to a Federal Judge, to make a determination as to whether or not there was probable cause for a search warrant." Place was also told that he was free to accompany the agents on this trip. It was then that Agent Iglesias took the driver's license to run a computer check on it, which revealed no violations.

When Iglesias returned he again asked Place if the bags were his. Place said that the larger of the bags was definitely his but that he was unsure about the smaller because it had had his name tag on it in Miami and the tag was no longer attached. After the agents asked Place to provide the combinations of the bags' locks, which he refused to do, Iglesias picked up the bags and Whitmore gave Place a piece of paper with his office number and a 24-hour emergency number at which he could be reached. Place then ran after Iglesias and demanded that he give his name and badge number. Iglesias gave his name and said that he could be reached at the same telephone numbers.

The agents put the bags in the car and drove to Kennedy Airport, leaving at about 4:10 P.M. and arriving approximately 35 minutes later. After a delay in finding a

dog handler, the suitcases were subjected to a "sniff test" by "Honey," a dog trained to detect controlled substances. At about 5:30 or 5:40 P.M. Honey reacted positively to (i.e., detected a controlled substance in) the smaller bag and neither positively nor negatively to the larger. Agent Whitmore contacted the United States Attorney's office and asked for instructions. He was told to wait until Monday morning (the day being Friday) and at that time to come to apply for a search warrant.

On Monday morning Agent Iglesias applied for a search warrant for both bags. A federal magistrate granted a warrant for the smaller bag only on Monday afternoon. On opening that bag Agent Whitmore found bags containing 1,125 grams of cocaine. The indictment, motion to suppress, and guilty plea followed.

## DISCUSSION

■ At the outset, review of a few relevant constitutional principles is helpful. The Fourth Amendment protects not only "persons" but their "effects" against "unreasonable" government "seizures." With rare exceptions the seizure of a person or his effects is deemed *per se* "unreasonable" unless a warrant has first been obtained from a neutral magistrate upon a showing of probable cause. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

■ "Probable cause," while not requiring evidence sufficient to convict, *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963), nevertheless cannot exist in the absence of sufficient evidence to lead a reasonable and prudent person to believe, not merely suspect, that a crime has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *United States v. Ceballos*, 654 F.2d 177, 184–185 (2d Cir. 1981).

■ Even in those rare instances where warrantless seizures are permitted, such as the "automobile exception," *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the police must still have probable cause, *id.* at 51, 90 S.Ct. at 1981, but the seizure is allowed for the reason that, because of the exigencies of the situation with which they are confronted, the police cannot obtain the timely issuance of a warrant without losing the criminal or his contraband. Even in those exceptional cases the powers of law enforcement agents have been carefully restricted, see, e. g., *Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Seizures for "investigatory" purposes have consistently been declared unconstitutional, see, e.g., *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

" 'The requirement of probable cause has roots that are deep in our history.' *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959). Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment.... The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule. See *Brinegar v. United States, supra*, at 175–76, 69 S.Ct. at 1310–1311.

"... A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the

principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway v. New York*, 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979).

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court opened a narrow exception to the foregoing principles, permitting a brief "on-the-spot" investigative stop of a person by police where probable cause did not exist but the officers were possessed of sufficient specific articulable facts to justify a reasonable suspicion that the person stopped was engaged in unlawful activity. Sée in accord, *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The exception was made for the reason that upon balancing the public interest in protection from crime against the individual's right to security of his person and effects free from arbitrary interference by law officers, it was decided that the intrusion was so "minimal" in contrast to traditional arrest and seizure that a limited leeway should be permitted in the interest of law enforcement. *Dunaway v. New York, supra,* 442 U.S. at 209–11, 99 S.Ct. at 2254–55. Indeed some members of the Court (Justices Stewart and Rehnquist) were of the view that such conduct did not amount to a "seizure" as that term is used in the Fourth Amendment, *United States v. Mendenhall*, 446 U.S. 544, 551–57, 100 S.Ct. 1870, 1875–78, 64 L.Ed.2d 497 (1980).

Thus the degree to which a person's liberty may be curtailed when law enforcement agents have less than probable cause is determined by balancing the "public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. at 2578. *Terry* upheld the brief stop and frisking of a suspect for weapons as justified by the combined governmental interests in preventing crime and in protecting police officers confronting potentially armed suspicious individuals. *Brignoni-Ponce* upheld the stopping of an automobile and the questioning of its occupants within 100 miles of the Mexican border when reasonable suspicion existed and the procedure generally took less than a minute. 422 U.S. at 880, 95 S.Ct. at 2579.

*Terry* soon provided the principal weapon used by law enforcement authorities to curtail use of commercial airlines as a means of unlawful transportation of narcotics and other contraband. Passengers suspected of acting as couriers could now lawfully be stopped for interrogation by officers having a reasonable basis for suspecting them of criminal activity. Gradually various sets of circumstances deemed sufficiently objective and articulable in combination to justify a reasonable suspicion of unlawful activity were developed, with courts usually sympathetic toward upholding investigative stops on the basis of facts that would normally be viewed as innocent but for characterizations of government agents, including a "nervous" appearance on the part of the passenger; his arrival from a "source" city (i. e., a city described on the *ipse dixit* of drug enforcement law officers as a drug-trafficking center, without any supporting evidence); the passenger's looking "steadily ahead" after alighting from a plane; his frequently glancing sideways or backwards as if searching for someone; his deplaning as the first of the alighting passengers; his deplaning last; his cash purchase of his ticket rather than through a credit card; his appearing to be a person of Hispanic background; the "reputation" of the passenger as a narcotics dealer; and the like. Some drug enforcement agents, such as the "ubiquitous" Agent Whitmore in the present case, see *United States v. Forero-Rincon*, 626 F.2d 218, 220 n.4 (2d Cir. 1980), were recognized as having made stops in a substantial number of past instances where their suspicions proved to be correct but without evidence as to the number of instances in which innocent passengers had

been subjected by them to investigatory stops. Such airport stops, for instance, have been upheld by us in *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States v. Vasquez-Santiago*, 602 F.2d 1069 (2d Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); *United States v. Price*, 599 F.2d 494 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Riquelmy*, 572 F.2d 947 (2d Cir. 1978); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977). However, in *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980), we concluded that the complex of conduct viewed by Agent Whitmore in that case was "wholly insufficient to constitute 'specific and articulable' facts supporting a reasonable suspicion that [the defendants] were involved in drug trafficking," *id.* at 36. Finally, an end was put to the gradual relaxation of the factors justifying reasonable suspicion by the Supreme Court in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), where it concluded that the drug enforcement agent at the airport "could not, as a matter of law, have reason-

ably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Id.* at 441, 100 S.Ct. at 2754.[1]

Turning to the present case, the record is clear that the drug enforcement agents did not have probable cause to arrest Place or seize his baggage at LaGuardia Airport. Nervous behavior, traveling from a so-called "source city," minor errors on a baggage tag, telling an undercover officer that his identity as such was recognized by the suspect, and the other factors involved here may be abnormal, but by themselves they are clearly not enough to constitute probable cause. The district court, while stating that it would not "pass on that question" (existence of probable cause), 498 F.Supp. at 1228 n.7, erred in suggesting that probable cause existed. The government points to a combination of circumstances observed by law enforcement officials at the Miami and LaGuardia Airports, which were found persuasive by the district court, as providing articulable facts justifying a reasonable suspicion of narcotics trafficking.[2] Place, on the other hand, lists

1. The lower court had relied on the facts "that (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags." 448 U.S. at 441, 100 S.Ct. at 2753.

2. At Miami International Airport the following facts were relied upon:
   "1. Defendant Place was departing from a 'source city.'
   "2. Defendant systematically scanned the immediate area in the lobby in which he was standing and looked very closely at each person that was seated or standing in that area.
   "3. Defendant noticed and paid close attention to Mr. McGavock when he left the line.
   "4. Defendant stared directly at the detectives two or three times as the detectives moved around the lobby.
   "5. When buying his ticket and checking his baggage, the defendant turned and looked over his shoulder to scan the lobby again.
   "6. Defendant paid for his ticket in cash.

"7. After leaving the ticket counter and heading toward the gate from which he was to depart, defendant stopped for no apparent reason, turned around to look at anyone who might be behind him, and headed back to the lobby from where he had just come.
"8. Upon reaching the lobby, defendant Place walked a full circle around the lobby while looking back over his shoulder continuously to see if he was being followed." 498 F.Supp. at 1224.
   The following additional facts were claimed to justify the LaGuardia Airport stop:
"1. Defendant Place broke out into a sweat when asked about narcotics by Detective McGavock and Facchiano in Miami International Airport.
"2. Defendant Place's parting remark to the same detectives that he had spotted them in the lobby.
"3. The discrepancy between the addresses listed on the identification tags attached to defendant's baggage.
"4. The fact that neither of those addresses were known to exist.
"5. Defendant's scanning activity in LaGuardia Airport.
"6. Defendant's nervous behavior and conduct in LaGuardia Airport.
"7. Defendant's spontaneous remark on being approached by the special agents that

other circumstances in rebuttal and argues that many of those relied on by the government are wholly consistent with innocence.[3] We find it unnecessary to resolve this issue for the reason that, even assuming that circumstances justifying an investigatory stop existed, the prolonged seizure of Place's baggage went far beyond a mere investigative stop and amounted to a violation of his Fourth Amendment rights.

■ Whether or not an investigative stop be labelled a "seizure," see *United States v. Mendenhall, supra,* 446 U.S. at 552, 100 S.Ct. at 1876, its legality depends on its brevity and relative unintrusiveness. The word "stop" implies an interruption of short duration, restricted to the immediate vicinity in which it occurred. "Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope," *Dunaway v. New York, supra,* 442 U.S. at 210, 99 S.Ct. at 2255. Applying the principle that "[t]he greater the intrusion, the stronger the basis for the officers' action must be," *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir. 1980), the investigative stop has been upheld only where it lasted for only a few minutes or less and was limited to the locale in which the suspect was found and his baggage located. See, e. g., *United States v. Brignoni-Ponce, supra,* 422 U.S. at 880, 95 S.Ct. at 2579 ("usually consumes no more than a minute"). Where the suspect has been removed by the police from the spot where he was confronted to another location such as a police station, even for a short period, the conduct has been held to violate the Fourth Amendment. See, e. g., *Dunaway v. New York, supra,* 442 U.S. at 212–13, 99 S.Ct. at 2256–57, which held unconstitutional a seizure of a defendant that, while not an arrest under state law, was so intrusive as to be "indistinguishable from a traditional arrest," 442 U.S. at 212, 99 S.Ct. at 2256.

It has been contended that *Terry,* while applicable to investigative stops of persons, should not permit police detention of "effects," since the latter, unlike a person, "cannot resume their course independent of the owner" after the property has been temporarily seized. See Comment, *Seizing Luggage on Less than Probable Cause,* 18 Am.Crim.L.Rev. 637, 645 (1981). However, for present purposes, in addition to assuming without deciding that an investigative stop was justified, we are willing also to apply the principles of *Terry* to seizures of property. If these principles were not applicable, the warrantless seizure of Place's baggage without probable cause would clearly violate the Fourth Amendment.

Applying the foregoing principles, it is apparent that the prolonged seizure of Place's baggage cannot be upheld as an investigative stop and will not stand constitutional scrutiny. The initial detention of Place and his baggage at LaGuardia, even if justifiable as an investigative stop, failed to yield any evidence providing probable cause for the arrest of Place or the further seizure of his baggage. No information was uncovered indicating that his baggage contained narcotics. He produced his New Jersey driver's license and his airline ticket receipt but refused, as was his constitutional right, to consent to a search of his baggage. At that point the agents were under a duty to release him and his baggage. Yet

'I knew you guys were cops. I spotted him as soon as I got out of the plane.'" 498 F.Supp. at 1225–26.

**3.** Place notes that at Miami:
    1. The stop was made because the detective "had a feeling."
    2. The information Place gave was accurate and the discrepancy on his luggage tags was minor.
    3. The detectives had no previous knowledge that he was involved in the "drug culture."

    4. There were no suspicious indications that Place had contraband hidden in his clothing.
    5. He was alone and therefore there were no suspicious signals or attempts to avoid being seen with compatriots.
    He further notes that at LaGuardia:
    1. He was not asked to explain his scanning or his nervousness even though he was being stopped in part because of them.
    2. A computer check of his driver's license revealed nothing suspicious about him.

the agents, while permitting him to go, took his baggage away from him, without his consent, for a substantial period of time, removing it to another location several miles away for a period of at least 1½ to 2 hours for the admitted purpose of determining whether it contained narcotics. The question before us is whether this amounted to a reasonable warrantless investigative stop of his baggage without probable cause within the meaning of *Terry*. We hold that it did not.

There can be no question but that if the agents had taken Place himself into custody and removed him from LaGuardia to the J.F. Kennedy Airport for the purpose, through use of a trained sniffing dog, of determining whether he had narcotics on his person, this would have constituted an unlawful seizure of him in violation of his Fourth Amendment rights. *Dunaway v. New York, supra*, 442 U.S. at 216, 99 S.Ct. at 2258 (removal of suspect to police station for interrogation without probable cause held to be an unreasonable seizure). It may be argued that a different standard of reasonableness should apply to a detention of baggage than that of a person, on the theory that the inconvenience to the owner from seizure of his baggage may be less than when he is personally arrested without a warrant and that the intrusion is less severe. But the Fourth Amendment does not draw any distinction between an unlawful seizure of a person and the similar seizure of his property. In both cases there is an infringement of the person's freedom of action. Police custody of his person precludes him from freely moving about. Police custody of his baggage deprives him of the use of it and its contents. Both create uncertainty and anxiety on his part.

The degree of intrusion and inconvenience accompanying police seizure of a person's baggage in a particular case may vary according to the specific circumstances, including the duration of the detention and the person's immediate needs. If, for instance, the owner were about to board another plane for distant parts, or needed medicine from his baggage essential for treatment of a heart or diabetic condition, or was deprived of documents or merchandise necessary to close an important business transaction, the seizure of his baggage for any substantial period of time could be extremely harmful or even catastrophic. If, on the other hand, the person were not in any such hurry or had no such emergency personal needs, it could be argued that a greater invasion of his personal freedom or use of his property should be tolerated. But the reasonableness of a detention without probable cause should not turn on whether the person affected is a healthy vagrant with time on his hands or a busy, ulcerridden bank president or doctor who needs his baggage immediately to perform important pressing missions.

Such a case-by-case status test is unacceptable. Courts which have addressed the reasonableness of particular forms of detention have focused on factors unrelated to the particular inconvenience to the individual in the specific case before them, concentrating on the general nature and extent of the detention. See, e.g., *United States v. Walling*, 486 F.2d 229 (9th Cir. 1973). It is this desire for an objective standard of equal application that has led to a recommendation by the American Law Institute that a detention not based on probable cause and not consented to be limited to a maximum of twenty minutes' duration. *ALI Model Code of Pre-Arraignment Procedure* § 110.2(1) (1975). Otherwise the "investigative stop" concept would soon undermine the basic probable cause requirement, which represents a careful weighing of the conflicting interests of the government in effective law enforcement and the individual in personal freedom. The standard must be judged according to the effect its application would have upon the average innocent passenger, and not, with the aid of 20–20 hindsight, by the success it yielded in uncovering contraband in a particular case. One must take into account the probably countless other cases where the detention without probable cause did not uncover any incriminatory evidence.

In the present case, if the agents had, on the basis of a reasonable suspicion but with-

out probable cause, merely exposed Place's baggage to a trained sniffer as he was passing through LaGuardia, this brief detention might, assuming reasonable grounds for suspicion, fall within the limits of *Terry* and its progeny. The invasion of his rights would then have been brief and minimal. Here, however, the "investigative" seizure lasted for almost two hours (from slightly before 4:00 P.M. until 5:45 P.M. when the sniffer established probable cause). Moreover, measured by the more objective gauge of what would have occurred if probable cause had not been established, the seizure would have been protracted for at least another 35 minutes, or until 6:15 P.M., before the baggage would have been returned from JFK Airport to LaGuardia and delivered to its owner.

In our view this protracted dispossession cannot reasonably be characterized as a *Terry*-type "investigative stop." It amounted to a seizure without probable cause of Place's effects in violation of his Fourth Amendment rights. The violation was exacerbated by the high-handed procedure adopted by the agents. They did not inform Place of the place to which they were taking his baggage or how long he might be dispossessed of it. Agent Iglesias simply removed the bags without consent and Agent Whitmore gave Place a piece of paper with his office number and a 24-hour emergency number at which he could be reached. Indeed, the agents lied to Place, informing him that they were taking the baggage to a federal judge when in fact they were transporting it to JFK Airport. As far as the owner was concerned the "investigative" seizure of his baggage might last for days or weeks. This conduct is not unlike the use of Writs of Assistance which led to the adoption of the Fourth Amendment. A person is at least entitled to be informed accurately of the reason for seizure of his effects, the place to which they are being taken, and, assuming probable cause is not found, approximately when he may expect the return of his property.

In reaching our decision we have not overlooked the seriousness of the suspected offense in the present case or the danger posed by the suspect to the public, which must be balanced against the individual's right to have his personal effects free of arbitrary interference by law enforcement officers. *Terry v. Ohio, supra,* 392 U.S. at 20–21, 88 S.Ct. at 1879–1880; *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. at 2578; *United States v. Mendenhall, supra,* 446 U.S. at 561, 100 S.Ct. at 1881 (Opin. of Powell, J.). The public interest in prevention of drug trafficking is great. *United States v. Mendenhall, supra,* 446 U.S. at 565, 100 S.Ct. at 1882. But the government has not adduced any evidence that intrusions of the seriousness inflicted here are essential to enforcement of our drug laws. On the contrary, the fact that the government keeps a trained drug sniffer at JFK Airport, which presumably is available for immediate scenting of baggage suspected of containing narcotics, would indicate that it should be able to maintain a similar facility at a busy airport such as LaGuardia. Indeed, having been alerted by phone calls from the detectives at Miami Airport, 2½ hours away by air, that Place was suspected of bringing drugs in his baggage, no reason has been shown why Agents Whitmore and Iglesias could not have had the sniffing dog, while Place was in transit, brought from JFK Airport to LaGuardia, ready to perform its task with minimum detention when Place arrived at LaGuardia.

The government's reliance upon *United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), as support for the seizure of Place's baggage is misplaced. That case is clearly distinguishable. There the owner of parcels deposited them as first-class mail with the U. S. Postal Service, thereby voluntarily relinquishing custody and control over them for the indefinite period (at least a couple of days) required for forwarding and delivery. Based on specific articulable facts justifying suspicion that the packages contained contraband, postal agents detained the packages, which were already in their lawful custody, for further investigation which led to issuance of a search warrant. Unlike

the dispossession of hand baggage in a passenger's custody, which constitutes a substantial intrusion, the mere detention of mail not in his custody or control amounts to at most a minimal or technical interference with his person or effects, resulting in no personal deprivation at all. Moreover, the *Van Leeuwen* Court was very careful to point out that "[w]e only hold that on the facts of this case" a short detention of mail is reasonable; it also conceded that "[t]heoretically ... detention of mail could at some point become an unreasonable seizure." 397 U.S. at 252–53, 90 S.Ct. at 1032–33. Under the circumstances of this case, reliance on *Van Leeuwen* is unjustified.

For these reasons we find unpersuasive the decisions of other circuits upholding on the basis of *Van Leeuwen* the constitutionality of detentions of baggage as *Terry*-type investigative stops. See *United States v. West*, 651 F.2d 71 (1st Cir. 1981); *United States v. Viegas*, 639 F.2d 42 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *United States v. Klein*, 626 F.2d 22 (7th Cir. 1980). Moreover, in none of these cases does it appear (1) that the detention of the baggage for investigation lasted for as long a period of time as in the present case, (2) that the baggage was removed from the airport to another location without the passenger's consent, (3) that the agents concealed their plans for investigation of the baggage, or (4) that they indicated that the baggage detention would be of indefinite duration. On the contrary, in each case the agents merely asked the suspect to wait for a short period of time while a sniffing dog was brought to the scene. Although in *Viegas* that baggage was retained at the airport for a longer period because of the unavailability of the dog, the suspect there had already expressly consented to "a detector dog sniff," 639 F.2d at 44. Thus the intrusions did not approximate the seriousness of that here. As indicated above, if such expeditious procedure had been followed in the present case the detention might then have been upheld as a permissible investigative stop. See *United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975), *cert. denied*, 424

U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976). It is simply not a "temporary detention for investigative purposes" when DEA agents seize suitcases against the owner's will at an airport, load them into the trunk of a car, drive to an undisclosed (indeed, misrepresented) destination, subject the luggage to secret tests never disclosed to the owner, and make no attempt to keep the owner informed as to the progress or likely duration of the investigation. Nothing in *Terry* justifies such a broad intrusion into a traveler's Fourth Amendment rights.

The judgment of conviction is reversed.

OAKES, Circuit Judge (concurring):

I happily concur in the well reasoned opinion of Judge Mansfield which conforms, I believe, wholly to the Fourth Amendment law as so far enunciated by the Supreme Court.

In so concurring, however, I by no means retract or qualify the view first enunciated for this court in a border stop case, *United States v. Barbera*, 514 F.2d 294 (2d Cir. 1975), and further elaborated upon in my dissenting opinion in *United States v. Vasquez*, 612 F.2d 1338, 1352 (2d Cir. 1979), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). That view, simply stated and deriving in large part from the views perhaps best expressed by Professor Anthony Amsterdam in his Holmes Lecture, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 367 (1974), that the Fourth Amendment should be read not atomistically, but regulatorily. Such a view leads one to conclude that in cases such as the so-called airport stop or search case here, sidestepping strict requirements of probable cause in warrantless searches or seizures should be permissible only if, as, and when the search or stop is made pursuant to duly adopted, proper, nondiscriminatory, and reasonable rules or regulations adopted by the appropriate governmental authority and subjected to appropriate judicial review. Absent such rules or regulations we are so much in the realm of the individual law officer's discretionary, subjective sense

of suspicion as to permit of the arbitrariness and unbridled official caprice that led our Forebears, as Judge Mansfield suggests, to adopt the Fourth Amendment. Until better advised by higher Authority, I will continue to take what some would call a narrow view of extension of the "exception" to the general rule of probable cause set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I am satisfied that Judge Mansfield has taken a similar view with conventional case support, and I write this concurrence only to refer to this somewhat less conventional view which nevertheless continues to find what seems to me like a receptive ear in some of the expressions in more recent Supreme Court opinions. *See, e. g., Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979):

> To insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor *upon some other substantial and objective standard or rule* to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry v. Ohio, supra*, 392 U.S. at 22, 88 S.Ct. [1868] at 1880.

(Emphasis added.)

IRVING R. KAUFMAN, Circuit Judge, dissenting:

The majority holds that the detention of Raymond Place's cocaine-filled luggage, even if an investigatory stop were justified, constituted a violation of Place's Fourth Amendment rights. It takes this position because it is of the opinion that a holding to the contrary would extend *Terry* "stops" into a general search warrant.[1] I cannot agree that the investigative stop of Place's luggage was unreasonable within the meaning of *Terry* or that affirmance of the district court's holding would produce an untenable result. Accordingly, I dissent.

The Fourth Amendment prohibits only those seizures which are "unreasonable." Although searches conducted without prior judicial approval are considered "unreasonable," *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), *Terry* instructs that a law enforcement official may, in appropriate circumstances, detain a person to investigate possible criminal activity without possessing either warrant or probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). In assessing the propriety of these so-called *Terry* stops, courts must evaluate the scope of the particular intrusion. *Id.* at 17 n.15, 88 S.Ct. at 1877 n.15. *See Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Furthermore, in determining the intrusiveness of a stop, the governmental interest in deterring criminal conduct must be balanced against the individual's constitutionally protected privacy. *Terry v. Ohio, supra*, 392 U.S. at 20–21, 88 S.Ct. at 1879–1880; *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *United States v. Mendenhall, supra*, 446 U.S. at 561, 100 S.Ct. at 1881 (Powell, J. concurring).

I fail to see how the majority, after weighing the competing interests involved here, could conclude that the *Terry*-type stop amounted to a seizure in violation of Place's Fourth Amendment rights. The public interest in holding the suitcase for a "sniff test" was compelling—detection of an individual who traffics in drugs. *See United States v. Mendenhall, supra*, 446 U.S. at 561, 100 S.Ct. at 1881 (Powell, J. concurring). Surely, the 1,125 grams of cocaine Place was carrying in his suitcase could not be regarded as an amount so

---

1. One cannot quarrel with the notion that *Terry* stops, approved by the Supreme Court, expanded the law in a manner which some seem to find unsettling. The Supreme Court, however, ever mindful of the need to protect precious Fourth Amendment rights, safeguards them zealously. The Court, guided by the tenets of the Constitution, has thoroughly considered the constitutionality of *Terry* stops and has resolved the issue. Where the facts fit the *Terry* principles, I do believe lower courts consider the Supreme Court's mandate the governing authority.

insignificant as not to warrant concern. In addition, if Place had been allowed to leave with his baggage, it is likely the evidence would have been destroyed. Indeed, just such a consideration forms part of the Supreme Court's rationale for permitting a warrantless seizure in some instances involving automobiles. *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Moreover, in answer to the agents' questions, Place falsely claimed several times that both he and his luggage had been searched in Miami, refused to admit that he owned a valise which clearly belonged to him, and suggested that the agent abandon his law enforcement duties. Coupling Place's behavior in the Miami and LaGuardia airports, conduct, we are told by experts, to be characteristic of a drug courier, with these responses reveals such a strong suspicion of illegal activity that the agents would have been remiss in their duty had they not detained Place's bags.

The majority, however, finds that a less than two-hour detention of Place's cocaine-filled luggage—not Place—outweighs even such a forceful governmental interest. Place, my brothers seem to deduce, suffered so great an inconvenience that his privacy interests were violated. I do not believe so. I must emphasize that this is not an instance of taking a person into custody, an event which must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Neither are we dealing with an actual search which must be grounded in probable cause. We merely must determine the propriety of detaining baggage. Furthermore, the majority seems to agree the investigatory stop of Place's person could have been justified. If this is so, the reasoning underlying their greater concern for Place's effects simply eludes me.

My brothers perhaps react so strongly not because the law calls for it, but because they are particularly offended by what they term the "high-handed procedure" of the agents. They fail to recollect that Place was offered the opportunity to accompany his bags. He refused, asserting he had pressing business elsewhere. Certainly Place may still have been inconvenienced had he gone with the agents, but the Supreme Court has suggested the appropriate alternative course of action to be followed: Place should simply have consented to a luggage search. *See Arkansas v. Sanders*, 442 U.S. 753, 764 n.12, 99 S.Ct. 2586, 2593 n.12, 61 L.Ed.2d 235 (1979). Instead, he asked whether an "arrangement," a euphemism for a bribe, could be made so that he could leave with his suitcases. Moreover, inconvenience has never been the sole standard for delineating the reasonableness of an investigatory stop. Causing an automobile to pull over merely because of an erratic pattern of driving with a subsequent questioning of the driver and a search of the car's interior has been held permissible by the Supreme Court. *See Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (U.S., 1981). Surely, this is a greater intrusion on an individual's privacy and convenience than a brief detention of baggage.

The majority, moreover, ignores the critical difference between an individual's privacy interests in the contents of his suitcases as distinguished from the suitcases themselves. In *United States v. Chadwick, supra*, 433 U.S. at 13 n.8, 97 S.Ct. at 2485 n.8, the Supreme Court explicitly distinguished between these two interests by stating that a person's principal privacy interest lies not in the baggage itself, but in the contents. *Accord, Arkansas v. Sanders, supra*, 442 U.S. at 764, 99 S.Ct. at 2593. A search of the interior of the suitcase, therefore, would have been much more intrusive than temporarily removing the bags from Place's possession.

Similarly, while recognizing the importance of the privacy interest in first-class mail, the Court in *Van Leeuwen* stated that no Fourth Amendment interest was disturbed by delaying the forwarding of mail because the privacy interest was in the packages themselves; that privacy was pro-

tected until the approval of a magistrate was obtained. *United States v. Van Leeuwen*, 397 U.S. 249, 253, 90 S.Ct. 1029, 1033, 25 L.Ed.2d 282 (1970). I am indeed aware of the possible difference between the privacy interest in packages placed in the mails and in luggage carried by an individual, a point the majority labors to emphasize. I do not, however, find such nebulous distinctions as persuasive as my brothers.[2] We are searching for principles to guide us by turning to *Van Leeuwen*, not *minutiae*, and it seems clear to me the Supreme Court's counsel is applicable to suitcases as well as to mail. By applying the Court's reasoning, the conclusion is inescapable that detaining Place's luggage did not violate his privacy interest.

I would hold, on the facts presented to us here, that the temporary detention of Place's luggage was a reasonable "stop" within the meaning of *Terry*. At the time the bags were detained there were objective and articulable facts to warrant the agents' belief that Place's bags contained contraband. This suspicion was based on the same conduct which justified the investigatory stop of Place's person. I believe we make bad law today in holding that a valise cannot be detained under the circumstances here. This, it seems to me, totally ignores the unwarranted hurdles we are placing in the path of agents engaged in the difficult task of controlling the heavy traffic in drugs.

---

2. I also remain unconvinced that decisions of other circuits which consider baggage detention a *Terry* stop are distinguishable. *See United States v. West*, 651 F.2d 71 (1st Cir. 1981); *United States v. Viegas*, 639 F.2d 42 (1st Cir.), *cert. denied*, 101 S.Ct. 2046 (1981); *United States v. Klein*, 626 F.2d 22 (7th Cir. 1980). The majority finds differences only through ignoring patent similarities with the situation here. My brothers, for instance, claim that the

agents indicated Place's luggage would be detained for an indefinite period. In *Viegas*, the agents' comments could fairly be said to imply the same notion. *See United States v. Viegas, supra*, 639 F.2d at 44. Furthermore, the argument for distinction is somewhat tenuous. How could it matter that the bags were moved to another location when the majority states that dispossession itself is the cardinal fault?