UNITED STATES of America,

v.

David Isaac WALTZER, Defendant.

No. CR 81–00388.

United States District Court,
E. D. New York.

Dec. 18, 1981.

E. R. Korman, U. S. Atty., E.D.N.Y. by Gregory Wallance, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Martin Stewart, New York City, for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

Mr. David Waltzer, charged with possession of cocaine, with intent to distribute, has moved to suppress certain statements and items of physical evidence taken from him by DEA agents on June 2, 1981 at Kennedy Airport. This Court conducted a hearing on October 19, 1981 and tentatively denied defendant's pre-trial motion to suppress the evidence in question pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure. This Court, after renewal of the motion after trial by Mr. Waltzer, now finds the following facts and attendant conclusions of law:

In the early afternoon of June 2, 1981, Deputy Sheriff Carl, a narcotics agent in Broward County, Florida, observed Mr. Waltzer enter the Delta Airlines Terminal at Fort Lauderdale Airport, a known narcotics source city (Tr. 6) and stand in a rather long line at the ticket counter. Agent Carl noticed that the defendant was extremely nervous, continually shifting his weight from one foot to the other, (Tr. 15) and looking from side to side, scanning the area. He turned around to look in the agent's direction "a couple of times at least." (Tr. 6–7).

After 15 or 20 minutes, Agent Carl approached the ticket counter. He observed the defendant identify himself as Mr. Walker to the ticket agent, and purchase with cash a reserved first class one way ticket on a 1:55 pm Delta Flight 1052 to Kennedy Airport. (Tr. 9). After the defendant checked his two suitcases, Agent Carl went to the outside baggage loading area and positioned himself on top of the baggage conveyor belt on which the two bags were placed. He made detailed notes as to the description of the two bags, their claim numbers, and their identification stickers, one reading R. Walker, the other reading D. Walker. (Tr. 24–25). Agent Carl subsequently contacted Agent Williams of the DEA in New York, informing him of the defendant's imminent arrival at Kennedy Airport. He described to Agent Williams his observations of the defendant's behavior, physical characteristics and dress, as well as all the information he had noted about the two suitcases. (Tr. 10–11).

Based on this information, several DEA agents and a drug enforcement dog went to the Delta Airlines Terminal at Kennedy Airport. One of the agents, Darrell Smith, had trained the dog, Kane, to detect the presence of narcotics in closed containers. (Tr. 32–33).

Upon the arrival of defendant's flight at 4:35 pm (Tr. 63), Kane was taken to the Delta baggage area for Flight 1052. He jumped up on the conveyor belt and began sniffing each of the 100 to 150 suitcases (Tr. 37–38), "alerting" to the presence of narcotics in two bags, which Agent Smith eventually determined matched the description of the bags provided by Agent Carl in Florida. (Tr. 39–40, 42–43).

Meanwhile, DEA Agent Terry Valentine was stationed at Gate 7A, also in the Delta

Airlines Terminal, where passengers were disembarking from Flight 1052. The first person off the plane was the defendant, who bolted through the doorway of Gate 7A (Tr. 62–63), walking very fast. He slowed his pace suddenly, scanned the area, and entered a men's room. (Tr. 64). Agent Valentine, who was following a few yards behind, waited outside and two minutes later the defendant emerged, looked around again, and walked toward the stairs to the baggage claim area. (Tr. 64). Agent Valentine followed.

Before reaching the stairs, the defendant suddenly veered off to the left out of the flow of traffic and along a glass partition perpendicular to the stairs. At the next exit gate he turned, doubling back on the other side of the glass partition, all the while eyeing Agent Valentine. (Tr. 64–65). At the top of the stairs, he stopped, looked to the left and then proceeded down the stairs at a very slow pace. Hesitating at the first unused baggage carousel, he moved to Flight 1052's baggage carousel, hesitating again. (Tr. 66–67). He then walked over to a bank of telephones, and appeared to make a call, turning around towards Agent Valentine while doing so. (Tr. 67).

Thereafter, Mr. Waltzer continued his intricate and "curious ballet." *United States v. Place*, 498 F.Supp. 1217, 1219 (E.D.N.Y. 1980), *rev'd*, 660 F.2d 44 (2d Cir. 1981), *petition for rehearing and en banc review denied*. Walking toward the baggage carousels, he looked around and disappeared around a corner. As Agent Valentine followed, he re-appeared, stared at Agent Valentine and walked back to the carousel. (Tr. 67). Mr. Waltzer again went to the bank of telephones, appeared to make another call and returned to the baggage carousel for Flight 1052, looking again at the agent. Then, Mr. Waltzer went up the escalator. The agent followed, and as he reached the upper level, the defendant doubled back once again along the glass partition, reversed course and disappeared. (Tr. 67–68).

Agent Valentine went back downstairs to the baggage carousel where he saw Mr. Waltzer retrieve two suitcases. (Tr. 68). After being informed by the other agents that the dog Kane had "alerted" on these two suitcases, Agent Valentine and two other agents, Agent Murphy and Agent Mulhearn, approached the defendant, identified themselves and asked to speak with him. He agreed and when the agents asked if they could step out of people's way, he said, "Sure," walking with them to a spot a few yards away near the telephones. (Tr. 69, 113).

After giving his name and a New York State vehicle registration card to the agents, with noticeably trembling hands Agent Mulhearn asked Mr. Waltzer if he had baggage claim checks for his suitcases. He replied "No," and Agent Mulhearn then asked "What did you do with them?" whereupon Mr. Waltzer shrugged. (Tr. 70). When Agent Mulhearn asked him if he had his airline ticket, he said "No," and when asked what he did with it, Mr. Waltzer again shrugged. (Tr. 70).

At that point, the agent, having noticed something in the defendant's hand pointed to it, and said "what's that?" "What?" replied the defendant. "What's that in your hand?" the agent persisted. "I don't know," replied the defendant. (Tr. 70).

Agent Mulhearn then reached over and took the two baggage claim tickets from the defendant's left hand. (Tr. 70).

The inquiry continued. The agent asked what name the defendant was traveling under and the defendant replied "Huh?" The agent repeated the question. Mr. Waltzer said, "I don't know." (Tr. 72).

The agent asked if he was using the name Gary Walker, the name he had used to purchase his ticket in Florida. (Tr. 72).

"I don't know, what difference does it make?" The question was repeated and he answered, "Yes."

The agent asked why he had used an incorrect name and again received the same answer, "I don't know, what difference does it make?" (Tr. 72).

Mr. Waltzer was asked how long he had been in Fort Lauderdale.

"Two days."

"Why did you bring two big suitcases with you for a two day trip?"

"Well, that's all I have." (Tr. 72).

The defendant was then asked where he had stayed in Fort Lauderdale.

"With relatives."

"What was their address?"

"1052 52nd Street in Fort Lauderdale."

"How much money do you have on you right now?"

"A thousand dollars."

"Why would you have so much money with you on such a short trip?"

"Well, I wanted to entertain my relatives."

"Well, how much money did you spend while you were down there?"

"About $150."

"Did you stay with your relatives for just two days, why would you have to spend $150?"

"Well, I took them out for dinner."

"Where did you say your relatives lived?"

"1042 42nd Street." (Tr. 72–73).

Mr. Waltzer then indicated that he was traveling alone. (Tr. 74). After denying there were any drugs in the two suitcases he had retrieved from the carousel, Mr. Waltzer refused to give consent to the agents to search his bags. (Tr. 74).

The agents informed him that he was under arrest and advised him of his *Miranda* rights. (Tr. 74–75). Mr. Waltzer indicated that he understood them. Agent Valentine testified that approximately ten minutes had elapsed from the time he began speaking with Mr. Waltzer until the defendant's refusal to give permission to the agents to search his suitcases after which Mr. Waltzer was arrested. (Tr. 74).

After the arrest, the agents conducted a pat-down search of Mr. Waltzer, finding nearly $1550 in cash, his airline ticket in the name of Gary Walker, a key ring, some note paper and a bamboo tube, a device commonly used for sniffing cocaine which contained traces of the substance. (Tr. 76–77, 80).

Then, the DEA agents transported Mr. Waltzer to the DEA office at Kennedy Airport, about a ten minute drive from the Delta Terminal, where he was processed and fingerprinted.

While in the DEA office, Agent Valentine advised Mr. Waltzer that this was an opportunity for him to cooperate. (Tr. 81, 125). The agent informed Mr. Waltzer that a drug detection dog had reacted positively to his two suitcases, indicating the presence of narcotics, so that they were going to try to obtain a search warrant. He told Mr. Waltzer,. "if they weren't his suitcases to tell us whose they are" (Tr. 81, 125), "so we could arrest that person." (Tr. 81).

In response, Mr. Waltzer replied, "they are not mine, but I can't tell you whose they are, I would be better off in jail." (Tr. 81–82). The following morning the agents obtained a search warrant from Magistrate Caden. (Tr. 127). Upon examining the contents of each suitcase the agents discovered a plastic bag of cocaine in each suitcase. (Tr. 90, 127–132).

Mr. Waltzer challenges the initial stop, the inquiry by the agents, the removal of the claim checks from his hand, the arrest, his pre-arrest statements, the search of his pockets, the sufficiency of the papers on which the search warrant was granted and the search of the two suitcases,[1] as violative of his Fourth, Fifth and Sixth Amendment rights. Defendant claims that the DEA agents did not have reasonable suspicion or probable cause for stopping him initially,

---

1. The defendant states that the validity of the search warrant is at issue in the introductory section of his post-suppression hearing Memorandum of Law. This Court examined the affidavit submitted to Magistrate Caden pursuant to the application for the search warrant during the hearing and found it to be sufficient. (Tr. 170). Since the defendant does not further brief the issue in the body of his Memorandum of Law, we find no cause to make an additional finding as to the sufficiency of said papers or the consequent validity of the search warrant.

for arresting him or for searching his two suitcases pursuant to the search warrant.[2] He therefore asserts that his pre-arrest statements, the claim checks and the items found in his pockets after his arrest, as well as the cocaine found in his suitcases,[3] should be suppressed.

In the alternative, defendant argues that these should be suppressed because the DEA agents should have arrested the defendant sooner, and informed him of his rights under *Miranda* earlier. He contends that he was in a custodial situation during the initial interview because the agents had no intention of letting him go even before they spoke to him knowing that the drug enforcement dog had "alerted" to his two suitcases before they approached him.

Defendant also argues that, failing the previous argument, the removal of the claim checks from his hand converted the *Terry* stop to an arrest requiring *Miranda* warnings and that such action by the agent was an improper search and seizure.

### Discussion

As has been noted countless times, the Fourth Amendment prohibits only searches and seizures which are not reasonable.[4] In reviewing the circumstances of the initial stop of Mr. Waltzer by the agents and the inquiry which followed, we find that this "reasonableness" standard has been met.

▇▇▇ Under the guidelines of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[5] a law enforcement official may make an investigative stop if such a stop is based on "specific and articulable" facts, pointing to a reasonable possibility of involvement in narcotics trafficking. *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977). In this case sufficient articulable facts existed to justify arousing the agents' reasonable suspicions and to allow them to make an initial investigatory stop. These facts were:

1. Agent Carl· had notified the DEA agents in New York of Mr. Waltzer's nervous behavior in the Fort Lauderdale airport, of his purchase of a one way first class ticket to Kennedy Airport with cash and of the discrepancy in the initials on the two suitcases he had observed on the conveyor belt. (Tr. 62).

2. Fort Lauderdale is a known "source city for narcotics." *See United States v. Price*, 599 F.2d 494, 501 n. 9 (2d Cir. 1979).

3. The lengthy and circuitous route of defendant's travels on his way to the baggage carousel, following his speedy exit from the plane, his continual scanning of the area and sudden turning of his head in the agent's direction, the sudden changes of pace and direction, as well as the several trips up and down the stairs and escalators, all the while seemingly aware of Agent Valentine.

4. Mr. Waltzer's retrieval of the two suitcases to which the drug enforcement dog Kane had alerted when he had sniffed all the luggage coming off Flight 1052.

▇▇▇ Even though probable cause for arrest may have existed at the time of the initial *Terry* stop, defendant's argument that the agents were required to take him into custody at the earliest possible moment so that he would have the benefit of the *Miranda warnings* is without merit. In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Supreme Court specifically recognized that:

[T]here is no constitutional right to be arrested. The police are not required to

---

**2.** *Id.*

**3.** *Id.*

**4.** *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (and cases cited therein.)

**5.** The Supreme Court held in *Terry v. Ohio*, 393 U.S. 1, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), that an investigative stop is not violative of Fourth Amendment rights "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity is afoot ...".

guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause. *Id.* at 310, 87 S.Ct. at 417.

The defendant's contention that the agents should have informed him of his rights under *Miranda* when the *Terry* stop was made, is not supported by the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court explicitly restricted the application of the opinion to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise detained." Id. at 444, 86 S.Ct. at 1612. Subsequently the Court in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), ruled that even when a suspect was interviewed at a police station, *Miranda* warnings were not required because the suspect was free to leave:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive

environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Id.* at 495, 97 S.Ct. at 714.

In the instant case, Mr. Waltzer was approached by Agents Mulhearn and Valentine in a public place after he had retrieved his suitcases from the baggage carousel. After identifying themselves, the agents asked to speak with him in a polite manner, a request that he was free to refuse. They did not physically restrain him, threaten him or indicate that he was not free to do as he pleased. He willingly accompanied the agents to a spot out of the flow of traffic a few yards away near the bank of telephones. (Tr. 69, 113). *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J. concurring).

The record does not indicate that the agents intended to arrest Mr. Waltzer when they approached him. Regardless, the agent's subjective intent is not relevant. "The test must be ... an objective one." *United States v. Hall*, 421 F.2d 540, 544 (2d Cir. 1969). Unlike the defendant in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), who was seized and transported to a police station for further questioning, Mr. Waltzer was stopped and briefly questioned with his apparent consent in the open and public atmosphere of an airline terminal, a few yards away from the baggage carousel where the agents first approached him. (Tr. 69). The entire episode took only ten minutes (Tr. 74). Thus, it was "an interruption of short duration, restricted to the immediate vicinity in which it occurred." *United States v. Place*, 660 F.2d at 50 (2d Cir., 1981).

This Court also fails to see the merit of defendant's contentions that the removal of the baggage claim checks from his hand converted the *Terry* stop into an arrest or custodial situation, or constituted an improper search and seizure. The removal of the baggage claim checks immediately followed the rather strange responses made by Mr. Waltzer to Agent Mulhearn's

inquiries as to whether he had baggage claim checks for his suitcases. While Mr. Waltzer was holding the stubs in question, he asserted he did not know what was in his hand. (Tr. 70). Agent Mulhearn then reached over and took the claim stubs from Mr. Waltzer's hand. It is true that any consentless search, incident to a *Terry* stop, must be based on a reasonable belief that the suspect is armed and dangerous and must be narrowly limited to a search for such weapons.[6] But no search was involved here. It was at most a *de minimus* intrusion, which did not place Mr. Waltzer in a custodial situation. He was not subjected to a frisk or a pat-down search or any other "annoying, frightening and perhaps humiliating experience." *Terry v. Ohio, supra,* 392 U.S. at 25, 88 S.Ct. at 1882, prior to his arrest. Other far more intrusive investigative stops have been held to be less than maximal intrusions not requiring probable cause or *Miranda* warnings. *See United States v. Pratt,* 645 F.2d 89, 90–91 (1st Cir. 1981) (air traveler subjected to pat-down by customs agents in a small windowless room was deemed not to be in custody and not entitled to *Miranda* warnings); *Terry v. Ohio, supra; United States v. Oates,* 560 F.2d 45, 57 (2d Cir. 1977) (officers told suspect to come with them).

■ When Mr. Waltzer was arrested, probable cause to do so clearly existed. The following factors in the record provide more than is necessary for a determination that probable cause existed to arrest Mr. Waltzer after he refused to consent to a search of his bags:

1. Mr. Waltzer's nervous scanning behavior in the Fort Lauderdale Airport;

2. Mr. Waltzer's speedy exit from the plane and the fact that he was the first passenger to disembark;

3. Mr. Waltzer's purchase of a one way first class ticket to Kennedy Airport with cash;

4. Fort Lauderdale being a known "source city" for narcotics;

5. The discrepancies noted in the initials on the identification stickers of the two bags by Agent Carl in Florida;

6. The drug enforcement dog's sniff-search of all the suitcases indicating the presence of narcotics in the two suitcases Mr. Waltzer subsequently retrieved from the Flight 1052 baggage carousel;

7. Mr. Waltzer's nervous, scanning behavior and evasive route to the baggage carousel for Flight 1052 in Kennedy Airport;

8. Mr. Waltzer's nervous demeanor, trembling hands and evasive, inconsistent responses to the agents' inquiries, including his use of three different names on his suitcases and airlines ticket, all different from his own, and his responses indicating two different addresses for his relatives in Florida;

9. Mr. Waltzer's lie that he did not have the claim checks for his suitcases.

In *Bronstein v. United States,* 521 F.2d 459 (2d Cir.), cert. denied, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1975), and *United States v. Johnson,* 660 F.2d 21 (2d Cir., 1981), the Second Circuit upheld the arrest of airport travelers in circumstances similar to the instant case. The Court found that "ample probable cause" existed on the basis of a sniff-search of luggage indicating the presence of narcotics, plus DEA Agents' observations of suspicious behavior by the owners of the luggage. *Bronstein v. United States, id.* at 463. The *Johnson* court found probable cause existed to arrest an airport traveler on the basis of a trained dog's alert to his suitcases and other "factors indicating that [the traveler] might have been transporting drugs." At 22.

■ For the same reasons, and since Mr. Waltzer had refused to grant permission, probable cause existed to seize the suitcases while efforts were made to obtain a search warrant to search and seize their contents. (Tr. 84, 127).

**6.** *Id.* 88 S.Ct. at 1883–1884.

Therefore, on the basis of the foregoing, defendant's motion to suppress his pre-arrest statements, the claim checks and the other items found in his pockets after his arrest, as well as the cocaine found in his suitcases, must be and hereby is denied.

SO ORDERED.